**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

DAMASCUS CITIZENS FOR SUSTAINABILITY,)
INC.  )
P.O. Box 147  )
Milanville, PA  18443  )
  )
CYNTHIA NASH  )
1049 River Road  )
Milanville, PA  )
  )    CIVIL ACTION – LAW
            Plaintiffs,  )
     v.  )    Docket No. _____
  )
SEAN DUFFY, SECRETARY  )
U.S. DEPARTMENT OF TRANSPORTATION  )
400 7th Street, S.W.  )
Washington, D.C.  20590  )
  )
KRISTEN WHITE, ACTING ADMINISTRATOR  )
FEDERAL HIGHWAY ADMINISTRATION  )
1200 New Jersey Ave., SE  )
Washington, DC 20590  )
  )
T. ALICIA NOLAN, ADMINISTRATOR  )
FEDERAL HIGHWAY ADMINISTRATION,  )
PENNSYLVANIA DIVISION  )
400 North St., Fifth Floor  )
Harrisburg, PA 17120  )
  )
MICHAEL B. CARROLL, SECRETARY  )
PENNSYLVANIA DEPARTMENT OF  )
TRANSPORTATION  )
400 North St., Fifth Floor  )
Harrisburg, PA 17120  )
  )
PENNSYLVANIA GOVERNOR JOSH SHAPIRO )
North 3rd Street  )
508 Main Capitol Building  )
Harrisburg, PA 17120  )
  )
            Defendants.  )
_____)

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

<u>INTRODUCTION</u>

1. This is an action for declaratory and injunctive relief against further planning, acquisition of right-of-way, financing, contracting, or demolition by Defendants of the historic Skinners Falls-Milanville Bridge ("the Bridge") which crosses the Delaware River between Damascus Township, Wayne County, PA and the hamlet of Skinners Falls in Cochecton, NY, as part of a federally-funded project for the emergency demolition of the Bridge, including the use of explosives to demolish the bridge trusses and the construction of a temporary causeway in the Delaware River to facilitate demolition of the Bridge ("the Project.")

2. The Bridge is located within the federally administered area of the Upper Delaware Scenic and Recreational River, which has been designated as a component of the National Wild and Scenic Rivers under the Wild and Scenic Rivers Act.

3. Plaintiff Damascus Citizens for Sustainability, Inc. ("Damascus Citizens") brings this action to challenge the decision of Defendants to reject the feasible and prudent alternative of rehabilitating the historic Bridge based on a pretextual "emergency" situation, despite the fact that Defendants' regulations provide that the situation does not warrant any exemption from federal environmental and historic preservation laws. Defendants' decision was preceded by years of neglect of the Bridge, resulting in its deterioration, and was based on the improper invocation of regulatory exceptions for "emergencies" to the otherwise required, detailed consideration of alternatives under: Section 4(f) of the Department of Transportation Act ("Section 4(f)"), 49 U.S.C. § 303(c); 23 U.S.C. § 138(a); the National Environmental Policy Act ("NEPA") 42 U.S.C. §§ 4321-

4370d; and Section 106  and 110(k) of the National Historic Preservation Act ("NHPA"),
54 U.S.C. §§ 306108; 306113; 36 C.F.R. Part 800. Defendants' approval of the
demolition and failure to undertake the necessary detailed review and evaluation of
alternatives that would avoid or minimize harm to the historic Bridge violates Section
4(f), NEPA, and the NHPA. This approval and these failures to review and evaluate also
violate Article I, Section 27 of the Pennsylvania Constitution, the Environmental Rights
Amendment ("ERA").

<u>JURISDICTION AND VENUE</u>

4.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.
§ 1331(a), 28 U.S.C. §§ 2201-2202, 28 U.S.C. § 1361, and 5 U.S.C. §§ 701-706.  Venue
is proper in this district under 28 U.S.C. § 1391(e) and 5 U.S.C. § 703.

<u>PARTIES</u>

5.   Plaintiff  Damascus Citizens is a nonprofit organization formed in 2008 under the laws
of Pennsylvania to protect the universal elements of life: clean water, air and land, and to
preserve natural, scenic, and historic resources.

6.  Plaintiff Cynthia Nash is an adult individual who resides and owns property in
Milanville, PA, which is a contributing property to the Milanville Historic District.  Her
home is within 500 feet of the historic Bridge, which is in the proposed blasting zone
planned to destroy the Bridge.  Ms. Nash has been actively involved in community
organizing, administrative action, and lobbying to secure adequate consideration of
alternatives that do not involve the destruction of the Skinner Falls Bridge.  She used,
enjoys and appreciates the Bridge and other resources within the Milanville Historic
District and the Upper Delaware National Scenic Recreation Area.   Prior to its closure,

Ms. Nash relied on the Bridge for swift, safe and easy vehicular access between New York and Pennsylvania. The Bridge was instrumental in saving Ms. Nash's life, since it made it possible to quickly get to Route 97 north to the Callicoon Hospital when she experienced a medical emergency several years ago. Her home will potentially experience seismographic impacts as a result of blasting conducted during the demolition phase of the Project. Her interests in preserving, protecting, and using the historic Bridge will be harmed by the Project.

7. Damascus Citizens has been actively involved in community organizing and administrative action to secure adequate consideration of alternatives that do not involve the destruction of the historic Bridge and other adverse impacts to nearby historic and environmental resources, and was a consulting party to the Project under Section 106 of the NHPA. Its Director, Barbara Arrindell, and a board member were also consulting parties. Damascus Citizens submitted multiple comments as a consulting party – both on the original project considering whether to replace or rehabilitate the Bridge, and on the "emergency" project that has turned into Bridge demolition. Its comments included issues raised again in this Complaint, including but not limited to noncompliance with the Section 106 regulations governing public participation and violations of federal and state law. Damascus Citizens also submitted comments of other members of the public to ensure that such material was in the administrative record. It contacted the Advisory Council on Historic Preservation ("ACHP") to inform it of the public process problems (e.g. lack of information and public involvement) in the emergency project, which resulted in the ACHP noting such concerns to the FHWA in the ACHP's December 20, 2024 letter. Attached as Exhibit 1. It sought answers from agencies such as U.S. Fish

and Wildlife Service, FHWA, the Pennsylvania Department of Environmental Protection, and the Philadelphia District of the U.S. Army Corps of Engineers regarding the status of permitting and authorizations for the Bridge demolition.  See, e.g. Exhibit 2, Attached.  It met with and provided information to the Upper Delaware National Park Service in regards to the Service's special use permit review for the proposed demolition.  Exhibit 3. It even submitted a Letter of Interest regarding ownership transfer of the Bridge, after PennDOT noted such a possibility.  Damascus Citizens and Ms. Nash intend to continue to use, enjoy, and appreciate the historic Bridge, including studying and appreciating its history and architecture.  Their interests in preserving and protecting this historic bridge will be harmed by the proposed action.

8.  The interests of Damascus Citizens and Ms. Nash are within the zone of interests intended to be protected by Section 4(f), the NHPA, ERA and NEPA.  These interests are and will continue to be aggrieved and adversely affected by the actions of Defendants complained of herein.

9.  Given their interest in and advocacy on behalf of protecting this historic district, Plaintiffs have a strong interest in ensuring that Defendants comply with the mandates of Section 4(f), the NHPA, ERA, and NEPA.  Plaintiffs have suffered and will continue to suffer injury in fact due to the Defendants' current and prospective failure to comply with Section 4(f), NHPA, ERA, and NEPA, unless the relief sought here is granted.

10. Defendant Sean Duffy is named here solely in his official capacity as Secretary of the United States Department of Transportation.  In that capacity, Defendant Duffy is responsible for the administration, operations, and activities of the Department of Transportation, including the Federal Highway Administration ("FHWA"), and for the

agency's compliance with NEPA, the NHPA, and Section 4(f).

11. Defendant Kristen White is named here solely in her official capacity as Acting
Administrator of the FHWA. In that capacity, Defendant White is responsible for the
administration, operations, and activities of the FHWA, and for the agency's compliance
with federal laws, including NEPA, the NHPA, and Section 4(f).

12. Defendant T. Alicia Nolan is named here solely in her official capacity as the
Administrator of the Pennsylvania Division of the FHWA. In that capacity, Defendant
Nolan is responsible for carrying out the NEPA, the NHPA and Section 4(f) reviews for
the Project.

14. Defendant Michael B. Carroll is named here solely in his capacity as Secretary of the
Pennsylvania Department of Transportation ("PennDOT"). In that capacity, Carroll is
responsible for the maintenance and repair of the Bridge, including oversight of
PennDOT District 4-0, which has played a central role in advancing the proposed
demolition of the Bridge. He has worked in partnership with the FHWA in developing
and selecting the alternative of demolishing the Bridge. He also signed a letter requesting
that FHWA Division Administrator Alicia Nolan concur in Pennsylvania Governor Josh
Shapiro's December 16, 2024 "emergency declaration."

15. Pennsylvania Governor Josh Shapiro is named here solely in his official capacity as the
Governor of the Commonwealth of Pennsylvania. He issued a letter purporting to be an
"emergency declaration" regarding the Skinners Falls Bridge.

<u>FACTS</u>

16. Constructed in 1902, the Skinner Falls Bridge ("the Bridge") is a single-lane, 466.5 foot
two-span, pin-connected Baltimore through-truss bridge and carries one single lane of

traffic across the Delaware River.

17. The Bridge is one of only three remaining pin-connected Baltimore through-truss bridges in the entire Commonwealth of Pennsylvania.

18. The Bridge is listed in the National Register of Historic Places ("NRHP") in its own right and is also listed as a contributing resource to the NRHP-listed Milanville, PA Historic District. It is also within the Upper Delaware Scenic and Recreational River, designated as a National Park Service (NPS) unit in 1978. The NPS considers this bridge a contributing element to the Outstandingly Remarkable Values ("ORV") (specifically Cultural and Scenic) for the Upper Delaware Scenic and Recreational River.

19. Per PennDOT: "The Skinners Falls Bridge was listed in the National Register of Historic Places (NRHP) in 1988 under Criterion C, Engineering, as a rare example of an intact multiple span Baltimore truss of moderate length and is a contributing element to the Milanville Historic District which was listed in the NRHP in 1993 under Criterion A for Industry and Criterion C for Architecture."

20. A 2021 letter from the then-Superintendent of the NPS Upper Delaware Scenic and Recreational River states:

> Recently re-evaluated and listed as a contributing element of the Cultural Resource ORV, the Skinners Falls-Milanville Bridge is an intact example of a two-span steel Baltimore Truss bridge constructed in 1902 by the American Bridge Company over the Delaware River connecting the Skinners Falls (Cochecton, NY) and Milanville, PA communities. Listed on the National Register in 1988 for significance under Criterion C – Engineering (Spero 1988), the bridge is also highlighted as a rare steel truss bridge in the 1992 Multiple Property Documentation Form National Register Listing, *Historic and Architectural Resources of the Upper Delaware Valley, New York and Pennsylvania* (Curtis 1992). The Milanville Historic District is significant for its connection to Industry and Architecture under Criteria A and C. According to the report, *A Context for Common Historic Bridge Types* prepared

for The National Cooperative Highway Research Program, the Transportation Research Council, and the National Research Council in 2005, Baltimore Truss Bridges are "Significant"; particularly highway bridge examples, which are not common.

The Skinners Falls-Milanville Bridge is the oldest example of an American Bridge Company Baltimore Through Truss Highway Bridge in the United States. Of extant Baltimore Through Truss Bridges in Pennsylvania and New York, the Skinners Falls-Milanville Bridge is the earliest example in the Upper Delaware region, in its original location, with multiple spans that is still in use as a highway bridge. A 2017 PennDOT Metal Truss Bridge Reevaluation states that the Skinners Falls-Milanville Bridge is noteworthy for the following reasons: an uncommon type, early example of type/design in the state, earliest example of type/design in district 4, regionally rare, with multiple spans, exhibits artistic value (lattice railing, highly ornamental and decorative cresting, and bridge plaque), and association with important designer, builder, or engineer.

**Retention of this historic bridge not only preserves and supports the Outstandingly Remarkable Values of the river valley, but also provides a unique economic opportunity to support heritage tourism in the valley.**

Attached as Exhibit 4 (emphasis in original).

21. The Bridge is jointly owned by New York and Pennsylvania, while the New York-Pennsylvania Joint Interstate Bridge Commission has control and oversight of the Bridge. The Commission has delegated primary responsibility for managing the Bridge, including inspections and maintenance, to PennDOT.

22. According to PennDOT's consulting firm responsible for the preparation of the August 2023 Historic Bridge Rehabilitation Analysis ("HBRA") Phase I report, the last time the Bridge was rehabilitated was in 1986. On information and belief, cracks in the NY abutment were observed and reported to PennDOT since 1991 without PennDOT taking any remedial action beyond rudimentary patching.

23. PennDOT repeatedly deferred maintenance for over a decade on critical deficiencies such as the Bridge's frozen (rusted tight) roller bearings, and the wingwalls (connected to the

Bridge abutments) – including the wingwalls on the NY abutment that PennDOT now claims is a key reason for demolition.  Such maintenance was classified as Priority 1, meaning it needed to be addressed within six months.  Instead, the priority of that work was *downgraded* to Priority 2 ("adjust schedule as needed") because the Bridge was closed to traffic.  Upon information and belief, that downgrading occurred in 2020.

24. This is despite the fact that a November 2020 inspection lowered the Bridge's substructure from a "3" (meaning serious condition) to a "2" (critical).

25. The Bridge's substructure remained a "2" until the October 2024 inspection cited by PennDOT as the reason to take such drastic action as Bridge demolition.

26. PennDOT even cancelled an underwater inspection scheduled for 2020 because the Bridge was closed to traffic.

27. The Bridge underwent emergency repairs in 2010, 2012, 2013, and 2016.  Originally constructed with a nine-ton load capacity, the Bridge had been posted for a four-ton capacity since 2013.  Nonetheless, the Bridge was used for emergency vehicle access.

28. Bridge inspection reports show that PennDOT repeatedly put off or cancelled major Bridge rehabilitation, in addition to crucial maintenance.

29. In October 2019, after an inspection revealed further deterioration of several bridge components, the bridge was closed to vehicular traffic, but remained open for pedestrian usage for several years.

30. In 2021, PennDOT, FHWA and New York State Department of Transportation ("NYSDOT")  (collectively, "Transportation Agencies") initiated a Planning and Environmental Linkages ("PEL") Study to be used as part of an overall project development process consistent with NEPA and FHWA implementing regulations (23

C.F.R. Part 771) to determine whether to rehabilitate and repair the Bridge, or to replace it with a substantially larger bridge. Attached as Exhibit 5.

31. As part of the PEL Study, a draft purpose and need statement was then provided to the public for review and comment between December 8, 2021 and February 7, 2022. Hundreds of commenters asked that the Bridge be rehabilitated and re-opened.

32. In the draft PEL study document, released for public comment in April 2024, PennDOT stated: "The top four comments mentioned restoration, historic significance, maintaining a crossing, and the aesthetics which reflect the significance of the Skinners Falls Bridge to the community." A chart included in the document shows comparatively few commenters in support of a larger bridge, with even fewer asking for emergency vehicle crossings.

33. The document also stated: "There is strong support for a crossing at this location, with interest for the ability of the structure to provide access for emergency services. Public comments showed strong support for rehabilitation because of the historic significance and aesthetics of the project area."

34. The final purpose and need statement stated that the purpose of the project is to provide a safe and efficient crossing of the Delaware River at Skinners Falls for cars, small trucks, trailers, emergency response vehicles, bicyclists, and pedestrians.

35. The needs included having "a functional bridge" in the vicinity of Skinners Falls for river rescue, fire and medical emergency response, and accommodations for pedestrians, bicyclists, and recreational users in the area.

36. None of these needs will be satisfied by the demolition of the Skinner Falls Bridge.

37. In September 2022, the Transportation Agencies re-started the Section 106 process for

10

the project.

38. In January 2023, as part of the PEL process, the Transportation Agencies released a Coordination Plan for Public and Agency Involvement for the PEL study.  This Plan identified the following federal agencies with permitting jurisdiction over any project affecting the Bridge who would be "cooperating agencies" for purposes of the NEPA review:  U.S. Army Corps of Engineers, U.S. Environmental Protection Agency, and the National Park Service.  The Plan also included extensive opportunities for involving the public and stakeholders in the planning and review of the project.

39. The Coordination Plan anticipated that an environmental assessment (EA) would be the appropriate class of NEPA documentation for the project, with an anticipated release date of Winter 2024.  The Plan anticipated the preparation of a Section 4(f) Statement, and compliance with the Endangered Species Act following the initiation of the NEPA phase.

40. In May 2023, PennDOT, through its consulting engineer, AECOM, completed a Phase 1 Historic Bridge Rehabilitation Analysis (HRBA) for the Skinners Falls Bridge to evaluate the effect of emergency repairs to the Skinner Falls Bridge.  The HBRA identified numerous structural deficiencies with the Bridge, and examined the viability of rehabilitating the existing bridge to various weight limits while retaining the bridge's character-defining features.  Attached as Exhibit 6.

41. The Phase 1 HBRA concluded that rehabilitating the Skinners Falls Bridge to a 10-ton weight limit was a viable option that does not include significantly more work than the minimum rehabilitation option, and would have no adverse effect on the historic structure.   The report noted that the Phase 2 HBRA would be prepared in the Winter 2024/2025 to examine how well the HBRA Phase 1 rehabilitation alternatives as well as

other non-traditional improvements will meet the project Purpose and Needs.

42. Throughout this process, the Upper Delaware Council ("UDC") repeatedly warned PennDOT that the extended period of time and money that PennDOT and its consultant were spending on whether to decide to rehabilitate the Bridge were allowing the Bridge to deteriorate further, without PennDOT undertaking critical maintenance. Attached as Exhibit 7.

43. On August 2, 2024, the UDC notified PennDOT of debris falling from the Bridge. UDC told PennDOT an urgent inspection was needed, and reiterated that PennDOT had allowed a substantial amount of time to pass since the Bridge had been closed to traffic without doing proper maintenance. Attached as Exhibit 8.

44. UDC also stated: "Preventative and mitigation measures need to be enacted based on a professional engineering assessment. We believe these could include installing a tarping collection system underneath the bridge and implementing an emergency Boater Safety Plan in conjunction with the NPS."

45. Later that day, a PennDOT District 4 executive informed UDC that, that very afternoon, PennDOT's "Wayne County bridge crew is on site checking for immediate safety concerns and have found none." Attached as Exhibit 8.

46. On August 3, 2024, a PennDOT consultant, Pickering, Corts & Summerson, undertook a limited inspection of the Bridge to address potential debris that might fall or had fallen from the Bridge.

47. PennDOT then announced plans to undertake measures, including installing netting to the Bridge superstructure and adding warning signs and buoys, to allow for safe passage of boaters within the vicinity of the bridge. PennDOT involved an engineering contractor

(JD Eckman) to determine how to install the netting. These plans were never implemented.

48. Instead, in November 2024, after a regular twice-yearly bridge inspection in October 2024, PennDOT determined "out of an abundance of caution," to dismantle the Skinners Falls bridge "in the interest of public safety, specifically for Delaware River boating and recreational traffic." Attached as Exhibit 9.

49. The October 2024 inspection was conducted by AECOM which is a different consulting engineering company than the one that performed the April and August 2024 inspections and prior Bridge inspections since, upon information and belief, November 2017.

50. AECOM, the consultant which prepared the PEL Study and the HBRA Phase I study, performed this October 2024 inspection.

51. In the October 2024 inspection report, AECOM downgraded the superstructure based on conditions that had been present since at least 2017 (such as frozen bearings) and that the HBRA Phase I study accounted for, but that the inspection report appeared to present and/or PennDOT presented as new or different changes.

52. The October 2024 inspection report lowered the substructure rating – which had been at "2" since 2020 – "due to significant deterioration" of the abutments, particularly the NY abutment. However, the conditions it cited for such deterioration were previously present and documented in prior inspection reports.

53. Again, the October 2024 inspection report accounted for *those same conditions* in the HBRA Phase I analysis.

54. In downgrading the Bridge's substructure, AECOM clarified that downgrading of the Bridge to "0" (meaning failed) "may be mitigated to '1-Imminent Failure' based on

13

bridge being closed to all traffic."  Exhibit 10 (Excerpt Only from October 2024 Inspection Report).

55. The difference in ratings is that a rating of 0 means that the Bridge is considered to have failed, while a 1 means that corrective action is still possible.  These rating numbers and definitions originate from the National Bridge Inventory System ("NBIS") rating scale.

56. Unlike its approach to maintenance, in which PennDOT downgraded critical priority work due to the Bridge's closure, it has consistently represented the Bridge as having a rating of 0 – meaning it has failed, even though the Bridge still stands.

57. On November 6, 2024, Christine Norris, P.E.  – PennDOT's Deputy Secretary for Highway Administration – authorized "emergency procurement" for the removal of the Bridge trusses, the NY abutment, and the center pier, which allowed PennDOT to dispense with typical state procurement procedures.

58. At a public meeting on November 14, 2024, PennDOT emphasized that the inspection revealed that the NY abutment had moved, and that the bridge was in a "failed state" which could as a result experience a sudden and catastrophic collapse, particularly after the temperature shifts occurring in winter.  This assertion is directly contradicted by PennDOT's inspection in October 2024, which shows that the NY abutment and wingwalls have not rapidly deteriorated as PennDOT has claimed.  Rather, the October 2024 inspection report shows that the NY northern wingwall monitoring points show no change in movement *for at least the past two years*. The NY southern wingwall's monitored point measurements have not changed during 2024, and in some cases have been stable since 2022.

59. At the November 14, 2024 public hearing, PennDOT announced plans to carefully

14

disassemble, catalog, and safely store the Bridge by a qualified contractor, as an interim action to protect the river users and the Bridge from harm. PennDOT also stated that the disassembly would not preclude the future off-site rehabilitation and eventual re-use of the Bridge at the current or a different location on the Delaware River as a viable alternative. Under this plan, both trusses would be disassembled, the NY abutment and the pier in the center of the river would be removed, and the stone masonry on the pier and abutment would be stored. The pier was to be removed at the request of other agencies concerned about an obstruction to navigation. Consulting parties were advised that plans for the disassembly would be made publicly available and the Section 106 process would proceed with the preparation of an agreement document, as contemplated by the PEL, under NEPA and Section 106.

60. Less than one month later, at a December 17, 2024 public meeting, PennDOT announced that it had rejected the previously discussed alternative of disassembling the bridge using cranes positioned on a temporary causeway at various locations and various dimensions as a result of a "declaration of emergency" issued by the Governor of Pennsylvania on December 16, 2024. Attached as Exhibit 11. As a result, PennDOT stated that it had selected a new alternative, never previously disclosed, of explosively removing the Bridge to a partial causeway and then demolishing it.

61. Upon information and belief, PennDOT made the decision to demolish the Bridge on December 6, 2024, without seeking the advice, input, or expertise of outside historic bridge consultants that it may have formerly retained for expert advice. Despite having internally made a decision to demolish the Bridge, when PennDOT announced (on December 8, 2024) the public meeting scheduled for December 17, 2024, it said the

meeting was "to provide an update on the *dismantling* of the Skinners Falls Bridge." (*emphasis added*)

62. At the December 17, 2024 meeting, PennDOT has never explained how it changed from proposing in November 2024, based on an October 2024 "in depth" inspection, that the Bridge be carefully dismantled and stored "out of an abundance of caution," to complete demolition less than a month later, based on the same inspection.

https://vimeo.com/1040415144?share=copy

At the December 17, 2024 meeting, PennDOT verbally described various alternatives to demolition such as the disassembly alternative (described as the selected alternative less than a month earlier), temporary bracing of the NY abutment, and netting of the structure to capture falling debris due to safety concerns over undertaking these measures. While PennDOT gave brief reasons for why these alternatives had been rejected, no written analysis of these alternatives was ever undertaken or circulated for public review and comment prior to the meeting as part of the NEPA, Section 106, or Section 4(f) process, nor was the public given sufficient time to comment on even the brief and conclusory information verbally presented at the meeting.

https://vimeo.com/1040415144?share=copy

63. On December 17, 2024 – the same day as non-agency Section 106 consulting parties and the public learned of the demolition alternative – FHWA concurred in the Declaration of Emergency.

64. On December 17, 2024, PennDOT made an "adverse effect" finding for the Bridge project under Section 106 and requested a five (5) day comment/concurrence period from

the Advisory Council on Historic Preservation ("ACHP") and Section 106 Consulting

Parties. Due to the declared emergency, PennDOT invoked the emergency procedures

under the Section 106 regulations, 36 CFR § 800.12.   On December 17, 2024, PennDOT

provided the public and non-agency Section 106 consulting parties, such as DCS, with a

five (5) day comment period on bridge ***dismantling***, which PennDOT converted to a

solicitation for comment on bridge ***destruction*** three days into the comment period,

giving the public ***two weekend days right before the Christmas holiday*** for public

comments.

65. Neither PennDOT nor FHWA provided the public with any information on the permit

applications or consultation requests submitted by PennDOT within the window for

providing comments. Upon information and belief, such applications and consultation

requests include the following:

    a.  Request for emergency consulting under Endangered Species Act ("ESA");

    b.  A "draft" submission to NPS "in advance of [an] upcoming meeting" between

        PennDOT and/or its consultant and NPS.  Upon information and belief, that draft

        submission consisted at least of a Section 106 approach, and a Hydrology and

        Hydraulics ("H&H") Analysis;

    c.  Performance of an initial NEPA categorical exclusion "evaluation" in PennDOT's

        categorical exclusion system;

    d.  New York State Department of Transportation ("NYSDOT") determination that

        the project is exempt from the New York State Environmental Quality Review

        Act, ("SEQRA"), which upon information and belief, was issued without a formal

        application but rather initiated based on NYSDOT's knowledge of the project;

66. Indeed, the U.S. Fish and Wildlife Service had already responded to FHWA's consultation request before the comment period closed for the public and non-agency consulting parties.

67. PennDOT and the FHWA failed to provide the public and non-agency Section 106 consulting parties with crucial data about the Bridge's condition, but also about the proposed demolition and its effects on the human environment (e.g., water quality, recreation, historic values, and endangered species).

68. As a result, the public and non-agency consulting parties could not meaningfully comment on, or even analyze, whether the project would comply with, *inter alia*, Pennsylvania's Clean Streams Law, the Clean Water Act; Article I, Section 27 of the Pennsylvania Constitution, and other laws, in addition to NEPA, Section 106, Section 4(f), and the Endangered Species Act.

69. On December 20, 2024, the ACHP staff responded to the PennDOT request for comments, stating that "the poor condition of the bridge has been known for at least five years, and it is unclear whether there was action that could have been taken that would have prevented its deterioration to the point of potential collapse.  As you know, 36 CFR 800.5(a)(2)(vi) identifies neglect of a property which causes its deterioration as an adverse effect itself. Utilizing the emergency procedures as a way to circumvent the meaningful consideration of avoidance or minimization measures to resolve the adverse effect undermines the intent of Section 106."  Attached as Exhibit 12.

70. PennDOT also determined that the project qualifies for a Categorical Exclusion ("CE") under the FHWA's regulations, 23 C.F.R. § 117(c)(9)(i), applicable to emergency repairs under 23 U.S.C. § 125.  On December 17, 2024, FHWA concurred in the declaration of

emergency, and notified the ACHP of its five (5) day comment deadline for consulting parties and state historic preservation offices.

71. On or about January 14, 2025, FHWA and PennDOT decided that while an Individual Section 4(f) Evaluation was required for the Project, the Project could proceed immediately in advance of compliance due to the project being declared an emergency by the Pennsylvania governor, in keeping with FHWA policy.  Attached as Exhibit 13, (Section 4(f) Approach, dated January 14, 2025.)

72. On or about January 28, 2025, PennDOT had a different consulting engineer, Michael Baker International, conduct what PennDOT has termed a "Quality Assurance" inspection of the Bridge.  In a February 25, 2025 radio interview, a PennDOT District 4 executive confirmed that, as to the NY abutment: (1) there were no new findings in January 2025 vs. October 2024, and (2) that the January 2025 inspection "showed the same findings that our October inspection did" and "mimicked what we found in October."  Attached as Exhibit 14 (Emails re: Radio Interview, QA Inspection, pp.3-4.)

73. On January 25, 2025, Damascus Citizens provided a set of recommendations from its expert bridge engineer Wrought Iron Bridge Works ("WIBW") for non-destructive stabilization of the historic Skinners Falls Bridge, which would allow the Bridge to be stabilized without large cranes or riverbed disturbances, and done in a way that is non-destructive, less costly, and faster than the proposed demolition and with less disturbance to ecological, archeological, and historical resources in the area. WIBW's letter pointed out that the measurement points during the last three bridge inspections did not show changes outside the margin of error of the measurement techniques, nor do the changes show a pattern of movement consistent with imminent failure.

74. By letter dated February 3, 2025, PennDOT summarily rejected WIBW's proposal, citing a host of reasons, such as concern that the stabilization would disrupt the start of the recreational boating season, and unspecified "ecological impacts."  None of these reasons cited in the letter demonstrate that the WIBW's plan would not effectively stabilize the Bridge sufficiently to allow for a thorough review and evaluation of less harmful alternatives under NEPA, the NHPA, and Section 4(f).

75.  PennDOT's letter does not assert that the stabilization measures would be infeasible, under Section 4(f), i.e., that they "cannot be built as a matter of sound engineering judgment." 23 C.F.R.  § 774(3) ("Definition of Prudent and Feasible Alternative").  Nor does PennDOT's letter assert that these measures would or could result in cost or community disruption of "extraordinary magnitude" that would justify rejecting these measures under the FHWA's implementing regulations. *Id.*

76. PennDOT's letter dated February 3, 2025 also stated that "PennDOT is willing to discuss transfer to any entity willing to take ownership."  Accordingly, on February 19, 2025, DCS submitted a letter stating DCS's interested in acquiring the Bridge.  Attached as Exhibit 20 (DCS Letter of Interest (via email)).  Notwithstanding the fact that DCS's offer had been expressly invited by PennDOT, on February 21, 2025, PennDOT declined DCS's offer, stating that a transfer of ownership "is no longer possible,"

77. On February 25, 2025, WIBW submitted a detailed response to PennDOT's February 3, 2025 letter, rebutting PennDOT's letter, and providing further information demonstrating that "a 30' tall falsework supporting one end of a 130 ton span (weight based on PennDOT estimate) is not a complex matter and would be erected on land," and the WIBW-proposed support structure would also "allow netting to be safely placed beneath

20

entire deck, protecting anyone passing beneath from potential debris without entering the water."  Attached as Exhibit 21.

78. On February 11, 2025, PennDOT held a Section 106 consulting party meeting to discuss "potential mitigation measures to offset the Section 106 Adverse Effect on historic properties, due to the proposed demolition of the Skinners Falls Bridge."

79. At that meeting, multiple non-agency consulting parties asked for a second opinion or an independent assessment of the Bridge's condition by an expert not connected to PennDOT.

80. PennDOT repeatedly refused, citing safety concerns and only wanting its insured and contracted professionals on the bridge.

81. At the time Michael Baker International conducted the January 2025 inspection, it had an "open-end" contract with PennDOT District 4-0. https://www.patreasury.gov/transparency/e-library/Home/ContractView?id=797502

82. Over the last 20 years, PennDOT has demolished at least 205 historic bridges.  Attached as Exhibit 15 (N. Holth Email.)

83. On or about February 28, 2025, PennDOT let and awarded a sole-source contract for bridge removal and causeway construction to JD Eckman, for an estimated total cost of approximately 8.17 million dollars.

84.  On information and belief, PennDOT has completed construction of the causeway and is in the process of preparing for demolition of the Bridge via use of explosives as rapidly as possible.

85. On information and belief, demolition will be undertaken by Implosion Technologies, LLC, the firm engaged by PennDOT and/or by the company PennDOT chose to manage

the bridge demolition project, to demolish the Bridge the second week of April 2025.

86. On or about March 27, 2025, Implosion Technologies advised property owners located within 500 feet of the Bridge on either side of the river that they would be provided with one-week's notice prior to the initiation of blasting activities, and that a brief evacuation would be advisable.

87. Absent equitable relief from this Court, the historic Bridge will be removed and irreparably destroyed by Defendants' violations of federal law and Pennsylvania constitutional law.  Plaintiffs have no adequate remedy at law and will suffer irreparable and permanent injury if not awarded relief by this Court.

## COUNT I

### (National Environmental Policy Act)

88. Plaintiffs repeat and re-allege all the foregoing allegations herein.

89. The National Environmental Policy Act (NEPA) requires federal agencies to prepare a detailed statement evaluating the environmental impacts of and alternatives to any proposed "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).

90. NEPA requires that for major Federal actions significantly affecting the quality of the human environment, a detailed statement shall be prepared by the responsible official on:

  **(i)** the environmental impact of the proposed action,

  **(ii)**  any adverse environmental effects which cannot be avoided should the proposal be implemented,

  **(iii)** alternatives to the proposed action.

42 U.S.C. § 4332(2)(C).

91. The FHWA's NEPA regulations specify that certain actions normally require a full environmental impact statement ("EIS"), and that actions for which the FHWA has not clearly established the significance of the environmental impact and are not subject to a CE require the preparation of an environmental assessment ("EA").  23 C.F.R. § 115(c).

92. The FHWA's regulations also identify other actions that may be subject to a Categorical Exclusion ("CE") from preparation of an EIS or EA because these actions have been determined not to individually or cumulatively have a significant environmental effect. *Id.* at § 115(b).  A specific list of CE's normally not requiring NEPA documentation is set forth in 23 C.F.R. § 771.117(c).

93. The FHWA and PennDOT determined that that the project qualifies for a Categorical Exclusion ("CE") under the FHWA's regulation governing "transportation facilities damaged by an incident that results in an emergency declared by the Governor of the State and concurred in by the Secretary."  23 C.F.R. § 117(c)(9).   To qualify under this CE, the facility must require (1) emergency repairs qualifying under 23 U.S.C. § 125, and (ii) must be for the repair of a bridge "that is in operation or under construction when damaged."

94. Projects qualifying for emergency relief under 23 U.S.C. § 125 are limited to "the repair or reconstruction of highways, roads, and trails. . . that the Secretary finds have suffered serious damage as a result of—(1) a natural disaster over a wide area, such as by a flood, hurricane, tidal wave, earthquake, severe storm, wildfire, or landslide; or (2) catastrophic failure from any external cause."  23 U.S.C. § 125(a).

95. In this case, the so-called "emergency" declared by the Governor of Pennsylvania involving the Bridge does not qualify under 23 U.S.C. § 125 because the emergency is

not a consequence of any natural disaster or external event. Instead, it is the result of PennDOT's failure to undertake necessary maintenance and repairs, resulting in potential "demolition by neglect" under the Section 106 regulations, 36 C.F.R. §800.5(a)(2)(vi).

96. Likewise, the contemplated demolition of the Skinners Falls Bridge does not constitute the "repair" of a bridge "that is in operation or under construction when damaged." *Id.* The project involves the demolition, not the repair of the Bridge, and the Bridge, which has been closed since 2019, was neither in operation nor under construction when PennDOT determined that the damage constituted an emergency.

97. The FHWA's regulations further provide that:

> (b) Any action which normally would be classified as a CE but could involve unusual circumstances will require the Administration, in cooperation with the applicant, to conduct appropriate environmental studies to determine if the CE classification is proper. Such unusual circumstances include:
>
> > (1) Significant environmental impacts;
> >
> > (2) Substantial controversy on environmental grounds;
> >
> > (3) Significant impact on properties protected by section 4(f) requirements or section 106 of the National Historic Preservation Act . . . ."

23 C.F.R. § 771.117(b).

98. The Bridge is a property protected by Section 106 of the National Historic Preservation Act and Section 4(f) of the DOT Act, and PennDOT has determined that the proposed demolition would adversely affect the Skinners Falls Bridge. The project will also impact aquatic resources and the endangered dwarf mussel. There has also been substantial public controversy regarding the impact of Bridge demolition on the River environment, including but not limited to scenic, aesthetic, aquatic, and potential

flooding impacts (from the partial causeway).  Therefore, the project does not qualify

for a CE.

99. In an October 2024 email, PennDOT admitted that: "An emergency declaration from the

president or governor would not likely help expedite the NEPA process for a few reasons:

23 CFR 771.117(c)(9) does not include removal only as an emergency scope of work that

can be documented as a [Level 1 CE]E1a."   Attached as Exhibit 16 (October 29, 2024

Email from PennDOT to FHWA.)

100.        Inexplicably, in December 2024, PennDOT took the exact opposite position,

stating in an email:

> This project qualifies for the above CE due to the emergency
> declaration from PA Governor Shapiro and the concurrence we
> received from the FHWA PA Division office. The CE approval is
> only for the emergency action and not for the permanent repairs.
> Regarding extraordinary circumstances: our understanding of the
> NPS NEPA Handbook is that extraordinary circumstances are those
> where a CE would not apply. This is similar to the FHWA NEPA
> regulations at 23 CFR 771.117.b, which lists circumstances that
> would normally be classified as a CE, but involve unusual
> circumstances. In this case, with the emergency declaration, we do
> not have unusual circumstances requiring an EA or and EIS under
> the FHWA NEPA regulations.

The email does not specify what "permanent repairs" would be done to a demolished

bridge.

101.        PennDOT performs its categorical exclusion "evaluations" on a web-based

system called the Categorical Exclusion Expert System ("CEES").  PennDOT filled out

two separate evaluations for the Bridge demolition: one on December 17, 2024

(approved on December 18, 2024), and another one (i.e. a "re-evaluation" on February

21, 2025 (approved the same day).  Attached as Exhibit 17 (February 21, 2025 CE Re-

evaluation and Document List) (also available at:

25

https://www.dominoappsbp.penndot.pa.gov/ceea/ceeamain03.nsf?Open&UrlPackageId
=38536 )

102.     In both, PennDOT had to answer the question: "Which type of repair does this
project involve?" with the choices being "emergency" or "permanent." For emergency
repairs, the system asks for a "Damage Inspection Report."

103.     Demolition of the Bridge is a permanent action (even if it were an emergency)
and is not a repair.

104.     In its initial December 17, 2024 evaluation, PennDOT stated that it was waiving
the scoping package requirement that CEES requires because: "Due to the emergency
nature of this project and the prior work done for the PEL Study, it is not required to
complete a scoping document."  Attached as Exhibit 18 (Dec. 17, 2024 Initial CE
Evaluation and Doc List) (also available at:
https://www.dominoappsbp.penndot.pa.gov/ceea/ceeamain03.nsf?Open&UrlPackageId
=38090)

105.     However, the PEL Study was done for the original decisionmaking process on
whether to rehabilitate or replace the Bridge, whereas the "emergency" action forecloses
the ability to consider the reasonable, prudent, and feasible alternative possibility of
rehabilitating the Bridge.

106.     Further, PennDOT's claim in the categorical exclusion evaluation conflicts with
what PennDOT told consulting parties in the February 11, 2025 meeting, which is that:
"The current emergency action is a separately funded and evaluated project than the
undertaking examined by the PEL study."

107.     Because no CE is applicable to the planned demolition of the Bridge, the FHWA

must prepare at a minimum an Environmental Assessment as required to assess the

individual and cumulative impacts of the Project on adversely affected historic

properties and evaluate all reasonable alternatives to this Project that would avoid,

reduce, or minimize these adverse effects.

108.    The Defendants' decision to designate the Project as categorically excluded from

NEPA and proceed with demolition without the preparation of an EA or EIS was

therefore arbitrary, capricious, an abuse of discretion, and not in accordance with law.

109.    PennDOT and FHWA failed to treat the addition of a new, preferred alternative

(demolition) as a significant change in circumstances mandating supplemental reporting,

consultations, and public commenting, which directly conflicts with the intent behind

NEPA, in addition to Section 4(f) and the NHPA.

110.    Accordingly, Defendants should be enjoined from any and all activities in

connection with this project that may adversely affect environmental, natural, scenic,

cultural and/or historic resources until such time as Defendants have fully complied with

NEPA.  Unless Defendants are so enjoined, Plaintiffs will be irreparably harmed.

## **COUNT II**

### **(Section 4(f) of the Department of Transportation Act)**

111.    Plaintiffs repeat and re-allege all the foregoing allegations herein.

112.    Section 4(f) of the Department of Transportation Act provides, in pertinent part

that the Secretary of Transportation:

> *shall not approve* any program or project . . . which requires the use of . . . any
> land from an historic site of national, State, or local significance as so determined
> by such officials *unless* (1) *there is no feasible and prudent alternative* to the use
> of such land, and (2) such program includes all possible planning to minimize
> harm to such . . . historic site resulting from such use.

23. U.S.C. § 138(a); *see* 49 U.S.C. § 303(c) (emphasis added).

113.    The Project requires the "use" of the historic Bridge within the meaning of

Section 4(f). Section 4(f) bars the FHWA from approving the demolition of the Bridge

unless the FHWA can demonstrate that there is no prudent and feasible alternative to the

demolition of the Bridge.

114.     Defendant FHWA has not yet prepared an evaluation or made a determination as

to whether alternatives which would avoid or minimize harm to the historic Bridge are

"prudent and feasible," as required by 49 U.S.C. § 303 and 23 C.F.R. § 774.3(a).

115.    Defendant FHWA has also not yet undertaken all possible planning to minimize

harm to the historic Skinners Falls Bridge, as required by 49 U.S.C. § 303 and 23 C.F.R.

§ 774.3(a).

116.        The FHWA's Section 4(f) regulations specifically provide that "Actions

requiring the use of Section 4(f) property, and proposed to be processed with a FONSI or

classified as a CE, shall not proceed until notification by the Administration of Section

4(f) approval."  24 C.F.R.  § 774.9(a).


117.    The FHWA's Section 4(f) Policy Paper provides that "Section 4(f) compliance

occurs during the 'implementation of projects' stage for both emergency repairs and

permanent repairs. For emergency repairs, Section 4(f) compliance is undertaken after the

emergency repairs have been completed."

118.    Nothing in the FHWA's Policy Paper supports the deferral of Section 4(f)

compliance where (1) the action does not qualify for a CE under the FHWA's own

regulations; (2) where the "emergency" is self-inflicted by the agency's own neglect of a

historic structure, and (3) there are alternatives to address any threats to public safety or natural resources that are less harmful than destruction of the historic Bridge. The Defendants' decision to proceed with demolition of the historic Bridge as an "emergency" will intentionally evade and circumvent the evaluations required by the aforementioned statute and regulation.

119.    Indeed, the FHWA Policy Paper confirms:

> Under the ER Program, ***repairs*** are categorized either as "emergency" or "permanent." Emergency repairs are made during and immediately following a disaster ***to restore essential traffic, to minimize the extent of damage, or to protect the remaining facilities***. Permanent repairs to restore the highway to its pre-disaster condition normally occur after the emergency repairs have been completed.

(***emphasis added***).

120.    FHWA's regulations make clear that the use of the term "*disaster"* refers to "A sudden and unusual natural occurrence, including but not limited to intense rainfall, floods, hurricanes, tornadoes, tidal waves, landslides, volcanoes or earthquakes which cause serious damage." 23 C.F.R. § 668.103

121.    FHWA's regulations explicitly provide that a "catastrophic failure" "*must not be primarily attributable to gradual and progressive deterioration or lack of proper maintenance.*"  *Id. (emphasis added.)*

122.    PennDOT's self-inflicted 20-plus years of deferred maintenance and of neglect of the Bridge is not a "disaster" as defined by the FHWA's own regulations that would permit Section 4(f). to be deferred until after the Bridge is demolished

123.    Nothing about demolition protects the Bridge, minimizes damage, or helps advance restoration of access for "essential traffic."

124.    PennDOT's own consultant has determined that rehabilitation of the Bridge is a

29

prudent and feasible alternative that satisfies the purpose and need for the Bridge Project and would avoid the use of Section 4(f)-protected properties.  See Exhibit 6.

125.    There are alternatives to Demolition that would allow the Bridge to be stabilized and the public safety to be protected while the FHWA complies with its obligations under Section 4(f) to determine the existence of prudent and feasible alternatives to demolition of the Bridge.

126.    Defendants violated and continue to violate Section 4(f) by approving the project despite the existence of the feasible and prudent alternative of rehabilitating the Bridge. Accordingly, Defendants should be enjoined from any and all activities in connection with this project that may adversely affect the historic Bridge.  Unless Defendants are so enjoined, Plaintiffs will be irreparably harmed.

## <u>COUNT III</u>

### (Section 106 and 110(k) of the National Historic Preservation Act)

127.    Plaintiffs repeat and re-allege all the foregoing allegations herein.

128.    Section 106 of the National Historic Preservation Act ("Section 106"), 54 U.S.C. § 306108, requires that Defendants "take into account" the effects of the Bridge Project on all historic properties, consistent with the requirements of 36 C.F.R. Part 800. Defendants failed to comply with these requirements.

129.    Section 106 requires Defendants to "ensure that the section 106 process is initiated early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking." 36 C.F.R. § 800.1(c). Defendants unlawfully failed to comply with this requirement, by failing to initiate consultation under Section 106 until after selecting their preferred alternative.

130.      "Foreclosure" of the ACHP's opportunity to comment "means an action taken by

an agency official that effectively precludes the Council from providing comments which

the agency official can meaningfully consider prior to the approval of the undertaking."

36 C.F.R. Part 800, Appendix A, (c)(2)

131.      The Section 106 regulations contain detailed provisions requiring agencies to give

concurring parties such as the state historic preservation officer ("SHPO"), the ACHP,

and members of the public and "consulting parties" such as DCS meaningful

opportunities to participate in the Section 106 process.  36 C.F.R. § 800.2.

132.      The FHWA failed to provide the public, participating agencies, or consulting

parties with a meaningful opportunity to participate when it set comment deadlines of

barely five days and by making key decisions prior to receipt of those comments.  The

Section 106 regulations also provide that:

> In the event an agency official proposes an emergency undertaking as an
> essential and immediate response to a disaster or emergency declared by
> the President, a tribal government, or the Governor of a State or another
> immediate threat to life or property, and the agency has not developed
> procedures pursuant to paragraph (a) of this section, the agency official
> may comply with section 106 by: . . . Notifying the Council, the
> appropriate SHPO/THPO [inter alia] . . .and affording them an opportunity
> to comment within seven days of notification.
> *Id.* § 800.12(b)(2).

133.      PennDOT and FHWA treated non-agency consulting parties such as Damascus

Citizens and its Director Barbara Arrindell as mere members of the public, and excluded

them from any opportunities to participate in decisionmaking or processes relative to

PennDOT's shift to demolition of the Bridge.  Furthermore, PennDOT and FHWA

repeatedly failed to provide non-agency consulting parties and the public information and

analysis crucial to commenting in an informed manner throughout the process, contrary

to the entire purpose of Section 106.  36 C.F.R. §§ 800.2(d); 800.3(e), 800.3(g)

(expediting consultation among the parties cannot occur at the expense of informed

public comment and involvement), 800.4(d)(2); 800.6(a)(2)-(4), 800.11.

Section 110(k) of the NHPA prohibits federal agencies from issuing permits or assistance to

an applicant "who, with intent to avoid the requirements of section 106, has intentionally,

significantly adversely affected a historic property" to which the permit or assistance would

relate. 54 U.S.C. § 306113; *see also* 36 C.F.R. § 800.9(c).  "Anticipatory demolition" occurs

"[w]hen an historic property is destroyed or irreparably harmed with the express purpose of

circumventing or preordaining the outcome of section 106 review (e.g., demolition or

removal of all or part of the property) prior to application for Federal funding."  63 Fed. Reg.

20496, 20503 (April 24, 1998).

134.    Under the Section 106 regulations, neglect of a property which causes its

deterioration is an adverse effect.  36 C.F.R. § 800.5(a)(2)(vi).

135.    If an agency nonetheless proceeds with this anticipatory demolition, when and if

an application for funding is submitted, the agency is required by Section 110(k) to

withhold the assistance sought, unless the agency, after consultation with the ACHP,

determines and documents that "circumstances justify granting such assistance despite the

adverse effect created or permitted by the applicant." 36 C.F.R. § 800.9(c).

136.    The "emergency" invoked by the Defendants is self-inflicted due to PennDOT's failure to

undertake necessary repairs to the Bridge for more than twenty years.  As the ACHP staff

pointed out, "[t]he emergency provisions of Section 106 were not intended to reward

demolition by neglect."

137.    The demolition is being funded by "federal-aid Surface Transportation Block Grant Program Off-System Bridge funds."  Attached as Exhibit 19.  Defendant FHWA has not yet undertaken the consultations and reviews taking into account the effects of the Project or alternatives and considering ways to resolve adverse effects, as required by Section 106.

138.    The Defendants' decision to proceed with demolition of the Bridge will intentionally evade and circumvent the consultations and reviews required by Section 106.

139.    Accordingly, Defendants should be enjoined from any and all activities in connection with this project unless and until they have completed proper compliance with Section 106.  Unless Defendants are so enjoined, Plaintiffs will be irreparably harmed.

## COUNT IV

### (Pennsylvania Gubernatorial Purported Emergency Declaration is *Ultra Vires* and Invalid)

140.    Plaintiffs repeat and re-allege all the foregoing allegations herein.

141.    The Pennsylvania Governor has specific powers under Pennsylvania law to declare an emergency.

142.    That authority is as follows:

   a.    Article IV, Section 20 of the Pennsylvania Constitution, entitled "Disaster emergency declaration and management" sets forth the Governor's authority and limitations on such authority, to declare a "disaster emergency." Pa. Const. art. IV, §20.

   b.    In 2021, Pennsylvania voters agreed to amend this provision of the Constitution to add, *inter alia*, a 21-day time limitation on any disaster emergency declaration issued by the Governor. *Corman v. Acting Sec'y of the Pa. Dep't of Health*, 266

33

A.3d 452, 457-459 (Pa. 2021).

c. Title 35 of the Pennsylvania Consolidated Statutes houses the Emergency Code, which "vests" the Governor "with broad emergency management powers." *Friends of DeVito v. Wolf*, 227 A.3d 872, 885 (Pa. 2020).

143.    If the Governor declares a "disaster emergency", additional requirements apply, such as publication and that the declaration be issued by executive order or proclamation. 35 P.S. § 7301(c).

144.    A review of Pennsylvania law reveals no other authority that allows the Governor to declare a "lesser" or other type of emergency declaration.

145.    Governor Shapiro's letter dated December 16, 2024, entitled "Declaration of Emergency in Relation to Skinners Falls" in which the Governor purported to "declare that an emergency" exists "in Wayne County of the Commonwealth because of the deterioration" of the Skinners Falls Bridge, clearly states: "This declaration is ***not*** a Proclamation of Disaster Emergency made under the authority vested in me pursuant to the Pennsylvania Constitution and Title 35 of the Pennsylvania Consolidated Statutes." (***emphasis added***).  See Exhibit 11, p.2.

146.    The letter is not an executive order or, on its face, a proclamation within the meaning of 35 P.S. § 7301(c).

147.    The letter was not published in accordance with the Emergency Code's requirements.

148.    The Governor's letter cited *no authority* that permits the supposed "emergency declaration" letter.

149.    Nor has PennDOT disclosed any such authority, despite repeated questions

to PennDOT counsel asking for the authority under which the Governor's declaration would be validly issued.

150.    The Governor's "emergency declaration" letter is invalid and *ultra vires* as a basis for invoking "emergency" procedures of federal and state environmental and historic preservation law.

151.    The Governor's letter has served as the basis by which PennDOT and the FHWA unlawfully bypassed or truncated multiple environmental and historic preservation reviews and permitting processes including but not limited to the following:

    a.  Truncate all public processes under Section 106 of the NHPA and NEPA;

    b.  Postpone consultation on resolving adverse effects of the Project under Section 106 and consideration of alternatives under NEPA and Section 4(f) until *after* demolition, thereby foreclosing consideration of virtually all measures to avoid, minimize, and/or mitigate adverse effects and environmental impacts of the Project;

    c.  Obtain an emergency consultation for Endangered Species Act ("ESA") clearance (despite this situation not qualifying as an emergency under the ESA, 50 C.F.R. § 402.05, regardless of the Governor's letter);

    d.  Claim a Level 1 categorical exclusion from NEPA; and

    e.  Obtain an exemption from New York's State Environmental Quality Review Act ("SEQRA").

152.    Accordingly, Plaintiffs respectfully request that this Court find the Pennsylvania Governor's December 16, 2024 letter, purporting to be a Declaration of Emergency, to be *ultra vires* and void, including for its use in invoking the requirements

of federal and state environmental and historic preservation law applicable to emergency situations.

### COUNT V:

### (Violations Of Pennsylvania's Environmental Rights Amendment Pa. Const. Art. I, § 27)

*Against Pennsylvania Defendants Only*

153.          Plaintiffs repeat and re-allege all the foregoing allegations herein.

154.          Article 1, Section 27 of the Pennsylvania Constitution, also known as the Environmental Rights Amendment ("ERA", "Amendment") states as follows: "The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people."

155.          The ERA is part of Article I of Pennsylvania's Constitution - the Declaration of Rights, all of which is "excepted out of the general powers of government and shall forever remain inviolate." Pa. Const. art. I, § 25.

156.          The ERA ensures that no Pennsylvania government entity – including the Pennsylvania defendants – acts in such a way as to infringe on Pennsylvanians' fundamental rights. *See Robinson Township v. Commonwealth*, 623 Pa. 564, 83 A.3d 901, 949-951 (Pa. 2013) ("Robinson II"), *Pennsylvania Environmental Defense Foundation v. Commonwealth*, 640 Pa. 55, 161 A.3d 911 (Pa. 2017) ("PEDF I").

157.    The Amendment requires PennDOT to engage in informed decisionmaking, and to ensure that the beneficiaries of the trust have information about how the trust corpus will be impacted by proposed activities such as Bridge demolition. *Robinson Twp. v. Com.,* 83 A.3d 901, 983 n.60 (plurality) (Pa. 2013); *Pa. Envtl. Def. Found'n. v. Com.,* 161 A.3d 911 (Pa. 2017).

158.    Damascus Citizens and its members, as well as Co-Plaintiff Nash, hold the rights set forth in the first sentence of the Amendment, specifically including the right to the "preservation of the natural, scenic, historic and esthetic values of the environment." Pa. Const., art. I, § 27, cl.1.

159.    PennDOT has not developed any plan to preserve the historic, esthetic, and scenic values that the Bridge contributes to Milanville, Cochecton, and to the Upper Delaware Wild and Scenic River.

160.    To the contrary, PennDOT has, after at least 20 years of watching the Bridge deteriorate, while undertaking minimal and non-substantial repair work not commensurate with ensuring the Bridge's survival, chosen a path of demolition within barely a few months' time.

161.    That demolition will cause a massive upheaval to local communities and result in harm to the historic, scenic, esthetic, ecological, and economic values that the Bridge provides, contrary to the rights held by Co-Plaintiffs and protected by the Amendment.

162.    Harm to the express values listed in clause 1 of the ERA include but are not limited to the following:

a.  Elimination of a doubly-listed National Historic Register Bridge;

     b.   Removal of an anchor point for the Milanville Historic District and permanent harm to that District;

     c.   Outsized disturbance to the riverine environment compared to other alternatives;

     d.   Flooding concerns due to the temporary causeway;

     e.   severing PA and NY river communities with no guarantee of a new bridge;

     f.   impact to river businesses reliant on recreation attracted by the historic, aesthetic, and scenic qualities that the Bridge and the River environment have provided for decades; and

     g.   potential long-terms impacts that cannot be restored from the causeway construction and removal, dropping the Bridge onto the River, and dragging of heavy pieces of metal out of the River with machinery, upsetting macroinvertebrate and other aquatic life residing in the River.

163.     Government actions, such as the Pennsylvania defendants' decision to summarily demolish the Bridge, may not "unreasonably impair" the rights enshrined in the ERA.  *Pa. Envtl. Def. Found'n. v. Com.*, 161 A.3d 911 (Pa. 2017).

164.     Thus, as with other fundamental rights in Article I, a strict scrutiny analysis is appropriate to make that determination by examining whether there is compelling government interest and if the least restrictive means were used. *In re. T.R.,* 731 A.2d 1276 (Pa. 1999); *Pap's A.M. v. City of Erie*, 812 A.2d 591, 611-13 (Pa. 2002); *Stenger v. Lehigh Valley Hosp. Ctr.*, 609 A.2d 796, 802 (Pa. 1992).

165.     The Skinners Falls Bridge is a historic structure that embodies a connection between the built environment and public natural resources.

166.        The Delaware River, across which the Bridge spans, and the fish and other wildlife that live in and from the river, are public natural resources.

167.        PennDOT is an executive agency of the Commonwealth, and as such is a trustee of the public natural resources.

168.        PennDOT's trustee obligation imposes a fiduciary duty to conserve and maintain the public natural resources.

169.        PennDOT also has a fiduciary duty to ensure that the rights of the people under the Amendment are not violated.

170.        PennDOT's proposed demolition of the Skinner Falls Bridge is a breach of its fiduciary duties under the ERA.

171.        PennDOT's proposed demolition poses an unreasonable likelihood of significant degradation to the natural, scenic, historic and esthetic values of the environment.

172.        PennDOT has an obligation to conduct a sufficient pre-action analysis of the impact of the demolition on these values and has failed to do so.

173.        A pre-action analysis, at a minimum, must demonstrate compliance with all existing process provided by applicable environmental and historic preservation statutes and regulations, including but not limited to NEPA, ESA, CSL, the NHPA, and the regulations promulgated thereunder.

174.        Actions taken by PennDOT with regard to the decision whether to rehabilitate, remove, or demolish the historic bridge are in significant non-compliance with the appropriate process, as detailed in prior counts of this Complaint.

175.        PennDOT's proposed action to demolish the Skinners Falls Bridge is a clear

violation of the Article I, Section 27 rights of the Plaintiffs.

176.        PennDOT's proposed action to demolish the Skinners Falls Bridge is a

breach of fiduciary duty owed to the Plaintiffs.

177.    Accordingly, Defendants should be enjoined from any and all activities in

connection with this project that may adversely affect environmental, natural, scenic,

cultural and/or historic resources until such time as Defendants have fully complied with

the ERA.  Unless Defendants are so enjoined, Plaintiffs will be irreparably harmed.


**RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

A) Declare the obligations and duties of Defendants to comply fully with the

requirements of Section 4(f), NEPA, and Section 106 and the Pennsylvania Environmental

Rights Amendment prior to any further planning, financing, or contracting for demolition of the

Bridge;

B) Issue injunctive relief directing all Defendants to refrain from any further, financing,

contracting, construction or demolition of the Project until Defendants have fully complied with

the requirements of NEPA, Section 4(f), Section 106 and the ERA;

C)  Declare the Pennsylvania Governor's December 16, 2024 letter, purporting to be a

Declaration of Emergency, to be *ultra vires* and void for purpose of satisfying the requirements

of federal and state environmental and historic preservation law governing compliance in

emergency situations.

D)  Award Plaintiffs their attorneys' fees, costs, and disbursements pursuant to applicable

laws, including but not limited to the Equal Access to Justice Act and Section 305 of the NHPA,

54 U.S.C. § 307105, and

     E)     Award such other and further relief as the Court may deem appropriate.

Respectfully submitted,

Date:  04/07/25

*/s/ Michael D. Fiorentino*
Michael D. Fiorentino, Esq.
LAW OFFICE OF MICHAEL D. FIORENTINO
PA I.D. No. 73576
42 E. Second St.
Media, PA  19063
(610)-566-2166
Email: mdfiorentino@gmail.com

*Attorney for Plaintiffs Damascus Citizens for*
*Sustainability, Inc. and Cynthia Nash (Local*
*Counsel)*

*/s/ Andrea C. Ferster*
Andrea C. Ferster, Esq.
Law Offices of Andrea C Ferster
DC Bar #384658
68 Beebe Pond Road
Canaan, NY 12029
Phone: 202-669-6311
Email: Andreaferster@gmail.com

*Attorney for Plaintiffs Damascus Citizens for*
*Sustainability, Inc. and Cynthia Nash*
*(Petition for Pro Hac Vice Admission Pending)*

*/s/ Lauren M. Williams*
Lauren M. Williams, Esq.
Greenworks Law and Consulting, LLC
PA I.D. No. 311369
8 Atkinson Drive #1746
Doylestown, PA  18901
267-360-6188
Email: lmw@greenworkslawconsulting.com
*Of Counsel/Non-Litigation for Plaintiff Damascus*
*Citizens for Sustainability, Inc.*

41