**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DAMASCUS CITIZENS FOR | ) | |
| SUSTAINABILITY, INC. and CYNTHIA NASH, | ) | |
| | ) | CIVIL ACTION – LAW |
| Plaintiffs, | ) | |
| v. | ) | Docket No. 3:25-cv-00625-KM |
| | ) | |
| SEAN DUFFY, SECRETARY | ) | |
| U.S. DEPARTMENT OF TRANSPORTATION, | ) | |
| et al. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR**
**TEMPORARY RESTRAINING ORDER**

INTRODUCTION

Pursuant to Local Rule 7.1, Plaintiffs Damascus Citizens for Sustainability, Inc.

("Damascus Citizens") and Cynthia Nash (hereinafter "Plaintiffs") hereby file this brief in

support of their motion for a Temporary Restraining Order ("TRO"), filed pursuant to Rule 65

(b) of the Federal Rules of Civil Procedure. Plaintiffs are seeking an emergency order to halt any

further actions taken by Defendant Pennsylvania Department of Transportation ("PennDOT")

and its contractors to demolish the historic Skinners Falls-Milanville Bridge ("the Bridge") as

part of a project funded by Defendant Federal Highway Administration ("FHWA") until the

Court rules on the fully briefed Motion for Preliminary Injunction.

PROCEDURAL HISTORY OF THE CASE

On April 7, 2025, counsel for PennDOT advised Plaintiffs that demolition of the Bridge

will begin on Thursday, April 10, 2025.  (See ECF Document 8-2, attached to Motion.) This

demolition action is being undertaken without compliance with numerous federal and state

environmental laws.  Emergency injunctive relief halting Bridge demolition is necessary to
preserve the *status quo* and avoid irreparable injury to this historic property.  Accordingly, on
April 7, 2025, Plaintiffs filed a verified complaint in this Court seeking declaratory and
injunctive relief.  Because demolition will take place on April 10, 2025, Plaintiffs filed earlier
today a motion for a TRO and preliminary injunction to halt the destruction of the Bridge.

<u>FACTUAL BACKGROUND</u>

This verified complaint sets forth specific factual allegations and supporting documents,
which are incorporated by reference in the motion for a TRO and in this brief.  The Skinner Falls
Bridge crosses the Delaware River between Damascus Township, Wayne County, PA and the
hamlet of Skinners Falls in Cochecton, NY, providing a key linkage between the two towns.  The
Bridge is both individually listed in the National Register of Historic Places and is a contributing
property to the Milansville Historic District, and is also within the Upper Delaware Scenic and
Recreational River.  Verified Complaint, ¶¶ 18, 19, 20, and Exhibit 4.

For the past 20 years, Defendants have failed to perform necessary maintenance and
repairs to the Bridge, resulting in its deterioration and closure to traffic in 2019.  Verified
Complaint, ¶ 29.  In its initial studies, Defendants recognized the Bridge rehabilitation was a
reasonable alternative, and initialed compliance with normal procedures under federal law for
evaluating environmental and historic preservation impacts.  Verified Complaint, ¶¶ 30-35 and
Exhibit 5.  However, in December 2024, Defendants announced they were relying on rarely-
invoked "emergency" procedures to short-circuit the required reviews, despite the fact that
inspection reports showed no change in the condition of the Bridge, Verified Complaint, ¶¶ 58,
60.  Defendants decided to rely on that exception despite its candid acknowledgment that the
Project does not qualify for an emergency exception from federal environmental laws. Verified

Complaint, ¶ 99, Exhibit 16.   PennDOT is now in the process of preparing for demolition of the Bridge via use of explosives. Verified Complaint, ¶ 84.

QUESTIONS INVOLVED

Whether Defendants unlawfully relied on "emergency" exceptions to Section 4(f) of the Department of Transportation Act ("Section 4(f)"), 49 U.S.C. § 303(c); 23 U.S.C. § 138(a); the National Environmental Policy Act ("NEPA") 42 U.S.C. §§ 4321-4370d; and Section 106 and 110(k) of the National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 306108; 306113; 36 C.F.R. Part 800, to circumvent otherwise required analysis, assessments and public process. Plaintiffs' claims under state law will be addressed in a subsequent brief.

STANDARD GOVERNING THIS COURT'S REVIEW

The standards for an injunction are well known: Plaintiffs must show (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Kos Pharmaceuticals, Inc. v. Andrx Corp*., 369 F.3d 700, 708 (3d Cir. 2004).  Application of these standards requires the issuance of a TRO in this case.

I        Plaintiffs Are Likely to Succeed on the Merits.

      A        Plaintiffs Are Likely to Succeed on Their NEPA Claims That Defendants Improperly Invoked a Regulatory Exception for "Emergency Repairs."

          1.   Statutory and Regulatory Framework Under NEPA

NEPA request that federal agencies prepare a detailed statement, called an Environmental Impact Statement ("EIS"), evaluating the environmental impacts of and alternatives to any proposed "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The FHWA has promulgated regulations implementing its NEPA

responsibilities in connection with the approval of federally funded transportation projects. These regulations identify actions that "that may be subject to a Categorical Exclusion ("CE") from preparation of an EIS because these actions have been determined not to individually or cumulatively have a significant environmental effect. *Id.* § 117(b). Actions that do not normally require an EIS and are not subject to a CE require the preparation of an environmental assessment ("EA"). 23 C.F.R. § 119(c). The EA contains a detailed evaluation including a discussion of alternatives, and must be made available for public and agency review for 30 days. *Id.* § 119 (d (h).

The FHWA regulations provide for CE for emergency repairs, under 23 C.F.R. § 771.117(c)(9), which provides as follows:

> The following actions for transportation facilities damaged by an incident resulting in an emergency declared by the Governor of the State and concurred in by the Secretary, or a disaster or emergency declared by the President pursuant to the Robert T. Stafford Act (42 U.S.C. § 5121):
> (i) Emergency repairs under 23 U.S.C. § 125:
> (A) Occurs within the existing right-of-way and in a manner that substantially conforms to the preexisting design, function, and location as the original (which may include upgrades to meet existing codes and standards as well as upgrades warranted to address conditions that have changed since the original construction); and
> (B) Is commenced within a 2–year period beginning on the date of the declaration.

This is the CE used by PennDOT and the FHWA to justify exempting the demolition of the historic bridge from NEPA review. As we now discuss, the plain language of that CE is inapplicable to the decision to demolish the Skinner Falls Bridge.

2.  Demolition of the Skinner Falls Bridge Does Not Comply with the Plain Language of the CE for "Emergency Repairs."

Here, the decision to demolish the historic Skinner Falls Bridge does not satisfy the plain language of the foregoing CE. First, the Governor's "Declaration of Emergency" was not issued because the Bridge was "damaged by an incident." Rather, as the federal Advisory

Council on Historic Preservation ("ACHP") found, "the poor condition of the bridge has been known for at least five years, and it is unclear whether there was action that could have been taken that would have prevented its deterioration to the point of potential collapse."  Verified Complaint, ¶ 69, Exhibit 12 (attached).  In fact, PennDOT's neglect of the Bridge goes back more than 20 years, as PennDOT's own report indicates: the last time the Bridge was rehabilitated was in 1986, with only limited emergency repairs conducted in 2010, 2012, 2013 and 2016. Verified Complaint, ¶ 22, Exhibit 6, at p.13.

Second, the planned demolition of the Bridge does not constitute "emergency repairs under 23 U.S.C. § 125."  23 C.F.R. § 771.117(c)(9)(i).  Under 23 U.S.C. § 125, funds for emergency relief are available only "for the repair or reconstruction of highways, roads, and trails, in any area of the United States, including Indian reservations, that the Secretary finds have suffered serious damage as a result of-(1) *a natural disaster* over a wide area, such as by a flood, hurricane, tidal wave, earthquake, severe storm, wildfire, or landslide; or (2) catastrophic failure *from any external cause*."  23 U.S.C. § 125(a) (*emphasis added*).

Demolition of a closed bridge that has deteriorated from years of neglect is not "emergency repairs," which FHWA regulations define as "[t]hose repairs including temporary traffic operations undertaken during or immediately following the disaster occurrence for the purpose of: (1) Minimizing the extent of the damage, (2) Protecting remaining facilities, or (3) Restoring essential traffic."  23 C.F.R. § 668.103.  The FHWA is undertaking none of these things:  demolition is the opposite of "repairs."  Nor does demolition serve the purpose of "minimizing the extent of the damage" or restoring essential traffic. *Id.*  To the contrary, demolition will permanently remove the historic Bridge crossing the Delaware River, which supplied an essential connection between the town of Skinner Falls, NY and Milanville, PA for

over 100 years.  Verified Complaint, ¶¶ 6, 165.

The damage to the Bridge was clearly not caused by any "natural disaster." Nor is the Bridge suffering any "catastrophic failure from any external cause." 23 U.S.C. § 125(a)(2).

Moreover, the deterioration of the Bridge was not caused by a "Catastrophic failure," defined by the FHWA as "[t]he sudden failure of a major element or segment of the highway system *due to an external cause  . . . The closure of a facility because of imminent danger of collapse is not in itself a sudden failure*." 23 C.F.R. § 668.103 (*emphasis added*)

It is notable that the specific bridge inspection report from October 2024 that downgraded the bridge from "1-Imminent Failure' - may be mitigated" to "0" (meaning failed) was simply and explicitly "*based on bridge being closed to all traffic."* Verified Complaint, ¶ 54, Exhibit 10 (*emphasis added*).

Finally, "External cause" is defined as "[a]n outside force or phenomenon which is separate from the damaged element and not primarily the result of existing conditions." *Id.* The poor condition of the Bridge is a result of PennDOT's failure to properly maintain and rehabilitate the Bridge is the direct result of "existing conditions." Verified Complaint, ¶¶ 69, 82, 160 Exhibits 6 and 12. Indeed, FHWA's regulations explicitly provide that a "catastrophic failure" *"must not be primarily attributable to gradual and progressive deterioration or lack of proper maintenance."* 23 C.F.R. § 668.103.  *See Nat. Res. Def. Council, Inc. v. Winter,* 518 F.3d 658, 680 (9th Cir.), *rev'd on other grounds,* 555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) (upholding district court's finding that the Navy's "emergency" was "a creature of its own making, i.e. its failure to prepare adequate environmental documentation in a timely fashion….it was not a sudden unanticipated event."); *Nat. Res. Def. Council v. Winter,* 527 F. Supp. 2d 1216, 1227 (C.D. Cal. 2008) (the purpose of an agency emergency exemptions from

NEPA is to "permit the government to take immediate remedial measures in response to urgent and unforeseen circumstances not of the agency's own making.")

FHWA is well-aware that the CE is inapplicable here.  In an October 29, 2024 email to an FHWA official, PennDOT admitted that: "An emergency declaration from the president or governor would not likely help expedite the NEPA process for a few reasons: 23 CFR 771.117(c)(9) does not include removal only as an emergency scope of work that can be documented as a [Level 1 CE]."  Verified Complaint, § 99, Exhibit 16.

The record clearly identifies numerous potential environmental impacts resulting from bridge demolition, including impacts to aquatic resources and endangered species, as well as adverse impacts to the Milanville Historic District. Verified Complaint, ¶ 99, Exhibit 16. PennDOT has recognized an "adverse effect" to historic properties, as has the ACHP.  Verified Complaint, ¶ 64. 69, 98 and Exhibit 12 (attached).   The FHWA's regulations specify that an EA should be prepared if an action covered by a CE involves "Significant impact on properties protected by Section 4(f) requirements or Section 106 of the National Historic Preservation Act." 23 C.F.R.  § 117(b)(3).  Accordingly, an EA, at the minimum, should have been prepared before the FHWA decided to demolish the bridge. 23 C.F.R. § 771.113(a).

B. Defendants Violated Section 4(f) of the Department of Transportation Act By Improperly Invoking Emergency Exceptions to the Normal Review Process.

Section 4(f) creates a substantive mandate providing that the Secretary of Transportation "shall not approve any program or project" requiring the use of historic sites where such use will have more than a de minimis impact "unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm" to the historic site, 23 U.S.C. § 138(a)(3) Section 4(f).   Under Section 4(f), the preservation of historic

properties are to be given "paramount" consideration in transportation planning. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 401, 412-13 (1971).

The FHWA's own regulations prohibit the FHWA from moving forward with a project prior to completion of Section 4(f). *See* 24 CFR § 774.9(a) ("Actions requiring the use of Section 4(f) property, and proposed to be processed with a FONSI or *classified as a CE, shall not proceed until notification by the Administration of Section 4(f) approval." See Corridor H Alternatives, Inc. v. Slater*, 166 F.3d 368 (D.C. Cir. 1999) (holding that the FHWA violated Section 4(f) by deferring most of the studies necessary to determine the highway's impacts on historic properties until after the commencement of construction).

The record in this case makes clear that there are prudent and feasible alternatives to the demolition of the Bridge, including but not limited to the option of carefully dismantling and storing it for future use--the option that was recommended by PennDOT in November 2024. Verified Complaint, ¶¶ 48, 58 and Exhibit 9. This option was recommended based on the same October 2024 inspection report that PennDOT relied on to later recommend demolition of the Bridge, based on concern that the NY northern abutment would fail. Yet that inspection report shows that the NY northern wingwall monitoring points show no change in movement *for at least the past two years*. Verified Complaint, ¶ 58. Indeed, in a February 25, 2025 radio interview, a PennDOT District 4 executive confirmed that, as to the NY abutment: (1) there were no new findings in January 2025 vs. October 2024, and (2) that the January 2025 inspection "showed the same findings that our October inspection did" and "mimicked what we found in October." Verified Complaint, ¶ 71, and Exhibit 14.

Notwithstanding this clear prudent and feasible alternative, FHWA opted, due to the purported emergency, to defer Section 4(f) compliance until *after* demolition occurs. Verified

Complaint, ¶ 71, Exhibit 13.  In doing so, it relied on guidance in its "Section 4(f) Policy Paper," Question 30, which provides that "In emergency situations, the first concern is *responding to immediate threats to human health or safety, or immediate threats to valuable natural resources*. Compliance with environmental laws, such as Section 4(f), is considered later. . . For *emergency repairs*, Section 4(f) compliance is undertaken after the emergency repairs have been completed." https://www.environment.fhwa.dot.gov/legislation/section4f/4fpolicy.aspx (*emphasis added*).

For the same reasons that no "emergency" exists under the FHWA's NEPA regulations, the deferral of Section 4(f) is not warranted under this policy paper.  First, the plain language of this policy paper indicates that emergency procedures are permitted only for "emergency repairs."  The Policy Paper explicitly states that "For permanent repairs, Section 4(f) compliance is undertaken as part of the normal NEPA project development process, just as it would be for any other type of Federal aid or Federal lands project (i.e. it must be completed prior to the authorization of right-of-way and construction)." *Id.*  Demolition of the Bridge is a permanent action, not a repair.  Moreover, demolition of a historic Bridge does not constitute a "repair" in any sense of the word.

Finally, the record makes clear that immediate threats to human health and safety can be addressed through emergency repair and stabilization measures.  Specifically, Plaintiffs submitted a detailed report by their historic bridge engineer Wrought Iron Bridge Works ("WIBW") for non-destructive stabilization of the historic Skinners Falls Bridge, which would allow the Bridge to be stabilized without large cranes or riverbed disturbances, and done in a way that is non-destructive, less costly, and faster than the proposed demolition and with less disturbance to ecological, archeological, and historical resources in the area.  The WIBW

measures also include netting to catch any debris that may fall from the Bridge. Verified

Complaint, ¶ ¶ 47, 73, 77 and See Exhibit 21.  *See also* Exhibits 22 and 23, attached hereto.

Accordingly, Plaintiffs have demonstrated a substantial likelihood of success on their claim

under Section 4(f).

C.  Defendants Violated Section 106 of the NHPA By Improperly Invoking Emergency
    Exceptions to the Normal Section 106 Review Process.

Defendants also failed to comply with its responsibilities under Section 106 of the

NHPA, which requires that Defendants "take into account" the effects of the Bridge Project on

all historic properties, in consultation with the ACHP.  54 U.S.C. § 306108.  The ACHP's

binding regulations set forth detailed consultation procedures that include ample opportunities

for participation by key agencies, consulting parties, and the public.  36 C.F.R. Part 800.  DCS

was a consulting party to the Section 106 process. Verified Complaint, ¶ 7.

Here, however, Defendants did not provide non-agency consulting parties and the public

information and analysis crucial to commenting in an informed manner throughout the process,

as required by the Section 106 regulations.  36 C.F.R. §§ 800.2(d); 800.3(e), 800.3(g)),

800.4(d)(2); 800.6(a)(2)-(4), 800.11. Verified Complaint, ¶¶  64, 65, 133.  Instead, Defendants

invoked a provision in the Section 106 regulations that may be used "[in the event an agency

official proposes an emergency undertaking as an essential and immediate response to a disaster

or emergency declared by the President, a tribal government, or the Governor of a State or

another immediate threat to life or property, and the agency has not developed procedures

pursuant to paragraph (a) of this section."   36 C.F.R. § 800.12(b)(2).  These procedures severely

limit the consultation and reviews that are normally part of the Section 106 process.

However, the demolition of the Bridge does not fit within the plain language of the

exemption for "emergencies" under the Section 106 regulations.  First, PennDOT's neglect of

the Bridge cannot be the basis for invoking the emergency procedures of the Section 106 regulations.  The FHWA regulations cited above make clear that for a "catastrophic failure" to constitute an emergency, "[t]he failure must not be primarily attributable to gradual and progressive deterioration or lack of proper maintenance."  23 C.F.R. § 668.103.  Consistent with this definition, as the ACHP clearly stated, "[t]he emergency provisions of Section 106 were not intended to reward demolition by neglect." Verified Complaint, ¶ 136, and Exhibit 12, attached hereto.  *See also Forest Serv. Employees for Envtl. Ethics v. U.S. Forest Serv.,* 397 F. Supp. 2d 1241, 1257 (D. Mont. 2005) (Agency's failure to do its job and the foreseeable consequences of that failure, is not an emergency).

Moreover, demolition is not "an essential and immediate response" to the purported "emergency" declared by the Pennsylvania Governor. Rather, as noted above, emergency repair and stabilization measures are feasible measures that can be taken.  Verified Complaint, ¶ ¶ 47, 73, 77 and See Exhibit 21.  *See also* Exhibits 22 and 23, attached.  *See, e.g. Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.,* 726 F. Supp. 2d 1195, 1232 (D. Mont. 2010) (court invalidated BLM's emergency action under a similar regulation, finding that "the decision went beyond what was "necessary to control the *immediate impacts* of the [situation].) Accordingly, Plaintiffs have a substantial likelihood of success on the Section 106 claims.

II.    A TRO Is Needed to Prevent Imminent and Irreparable Harm.

There is no question that the demolition of the Bridge would result in irreparable injury. "The act of demolition is irrevocable.  Consideration of alternative plans ... is permanently foreclosed once the structures have been razed." *Boston Waterfront Residents Association v. Romney*, 343 F. Supp. 89, 91 (D. Mass. 1972); W*ATCH v. Harris,* 603 F.2d 310, 312 n.2 (2d Cir. 1979) (demolition is generally irreparable.").  As further stated in the Complaint, the Defendants

acknowledge that the project will have an adverse effect on historic properties as well as an impact on aquatic resources and the endangered dwarf mussel. Verified Complaint, ¶¶ 64, 98, 99, and Exhibit 16. Accordingly, there can be no doubt that Plaintiffs have satisfied the irreparable injury prong of the standard for a TRO.

This irreparable harm to historic properties is neither remote nor speculative but indeed is imminent. As noted in the TRO motion [ECF Document 8-2], PennDOT confirmed on April 7, 2025, that demolition would occur via use of explosives on Thursday, April 10, 2025.

The Skinners Falls Bridge is not just another aging structure—it is a rare example of a Baltimore Through Truss, an exceedingly uncommon type of metal truss bridge with profound historical significance. The Bridge provides a vital link between the communities of Milanville, PA and Cochecton, NY. Verified Complaint, ¶¶ 6, 165. Over the years, PennDOT has exhibited a reckless indifference to the value that historic bridges bring to communities throughout the state: at least 205 historic bridges have been demolished by PennDOT in the past 20 years. https://historicbridges.org/penndot.htm. A TRO is necessary to preserve the *status quo* while this Court decides the motion for a preliminary injunction.

    C.    <u>Defendants will Not be Substantially Harmed by the Injunction.</u>

Against the inevitable and irreparable injury that will occur to Plaintiffs if demolition is allowed to proceed, Defendants will suffer no injury as a result of this delay. The purpose of this request for a TRO is simply to preserve the status quo while this Court entertains Plaintiffs' motion for a preliminary injunction. Therefore, issuing a restraining order until this Court decides Plaintiffs' motion for a preliminary injunction will not result in any meaningful delay, and hence, no costs to Defendants.

In the event this Court decides to grant the requested preliminary injunction, the resulting

delay in demolition will not result in any damages or injury that outweighs the irreparable harm

to Plaintiffs.  First, as noted above, Defendants knew that the decision to demolish rather than

carefully dismantle and store the historic Bridge did *not* satisfy the FHWA's regulations

governing these limited exceptions for "emergency repairs."  *See* email dated Oct. 29, 2024 from

PennDOT to FHWA, stating that "An emergency declaration from the president or governor

would not likely help expedite the NEPA process for a few reasons: 23 CFR 771.117(c)(9) does

not include removal only as an emergency scope of work that can be documented as a [Level 1

Categorical Exclusion]." Verified Complaint, ¶ 99, Exhibit 16.

       Nor will a delay in demolition result in any damages or injury to PennDOT that

outweighs the irreparable injury to Plaintiffs.  Unlike demolition of a historic structure, economic

harm is not irreparable.  While an injunction may delay a project, "delay is better than hasty and

irreversible action." *Society for the Protection of New Hampshire Forests v Brinegar*, 381 F.

Supp. 282, 289 (D.N.H. 1974).  As the U.S. District Court for the Middle District of

Pennsylvania determined in another case involving the demolition of a historic structure:

> Defendants . . .maintain that if an injunction is granted halting the demolition of the
> Telegraph Building they will suffer substantial financial losses.  *The financial harm that*
> *these defendants would suffer is outweighed in the Court's view by the irreparable harm*
> *that the Plaintiffs and the members of the Harrisburg community would bear if the*
> *building is demolished.*

*Weintraub v. Rural Electrification Administration*, 457 F. Supp. 78, 89 (M.D. Pa. 1978)

(*emphasis added*).  *See also Steubing v. Brinegar*, 511 F.2d 489, 496 (2d Cir. 1975)

("compliance with NEPA invariably results in delay and concomitant cost increases, and

Congress has implicitly decided that these costs must be discounted.") Accordingly, even if

injunctive relief will result in some financial harm to the Defendants, this harm is outweighed by

the irreparable injury to Plaintiffs if demolition is permitted to proceed.

D.    The Public Interest Favors A TRO

A TRO is clearly warranted in light of the strong "public interest in preserving . . . historic sites."  *WATCH (Waterbury Action to Conserve Our Heritage Inc.) v. Harris*, 603 F.2d 310, 315 (2d Cir. 1979).  As this Circuit has held, "we acknowledge historic preservation as a highly important societal interest.  As a civilization, we suffer a terrible loss if we do not make every reasonable effort to preserve our heritage, which may be enshrined in bricks and mortar as well as in books and documents."  *Concerned Citizens Alliance v. Slater,* 176 F.3d 686, 696 (3d Cir. 1999).

Further, as noted above, Plaintiffs have a substantial likelihood of success on their claims that Defendants' supposed "emergency" does not satisfy the plain language requirements under the FHWA's own regulations for utilizing "emergency" procedures in lieu of the normally required reviews and consultations.  As one court noted in issuing a preliminary injunction despite an agency's claimed "emergency": "[i]t comports with the public interest for the [agency] to comply faithfully with those procedures and to use the exceptional emergency procedures sparingly and only in compliance with its own implementing regulations."  *All. for Wild Rockies v. Cottrell*, 622 F.3d 1045, 1056 (9th Cir. 2010), *withdrawn and superseded on denial of reh'g en banc sub nom. All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011).  Accordingly, the public interest favors issuance of a TRO.

## CONCLUSION

PennDOT is poised to demolish the historic Skinner Falls Bridge under rarely-invoked emergency procedures despite its candid acknowledgment that the Project does not qualify for an emergency exception from federal environmental laws. A TRO would prevent this historic Bridge from being unnecessarily and irreparably destroyed while the Court considers the

arguments of the parties in the ordinary course of briefing for the Preliminary Injunction. For the reasons set forth above, Plaintiffs respectfully request that this Court grant the Emergency Motion for Temporary Restraining Order and Preliminary Injunction, and enter such further relief as it deems just and proper.

Respectfully submitted,

/s/ Michael D. Fiorentino
Michael D. Fiorentino, Esq.
LAW OFFICE OF MICHAEL D. FIORENTINO
PA I.D. No. 73576
42 E. Second St.
Media, PA 19063
(610)-566-2166
Email: mdfiorentino@gmail.com

Attorney for Plaintiffs Damascus Citizens for
Sustainability, Inc. and Cynthia Nash (Local
Counsel)

/s/ Andrea C. Ferster
Andrea C. Ferster, Esq.
Law Offices of Andrea C Ferster
DC Bar #384648
68 Beebe Pond Road
Canaan, NY 12029
Phone: 202-669-6311
Email: Andreaferster@gmail.com

Attorney for Plaintiffs Damascus Citizens for
Sustainability, Inc. and Cynthia Nash
(Petition for Pro Hac Vice Admission Pending)

/s/ Lauren M. Williams
Lauren M. Williams, Esq.
Greenworks Law and Consulting, LLC
PA I.D. No. 311369
8 Atkinson Drive #1746
Doylestown, PA 18901
267-360-6188
Email: lmw@greenworkslawconsulting.com

Of Counsel/Non-Litigation for Plaintiff Damascus
Citizens for Sustainability, Inc.