UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAMASCUS CITIZENS FOR SUSTAINABILITY, INC., and CYNTHIA NASH, <br><br> Plaintiffs, <br><br> v. <br><br> SEAN DUFFY, SECRATARY, U.S. DEPARTMENT OF TRANSPORTATION, et al. <br><br> Defendants. | CIVIL ACTION NO. 3:25-CV-00625 <br><br> (MEHALCHICK, J.) |

**MEMORANDUM**

A preliminary injunction is an extraordinary and drastic remedy, and a party seeking such relief must make a clear showing that it is entitled to that relief. In the matter currently before this Court, Plaintiffs, the Damascus Citizens for Sustainability, Inc., and Cynthia Nash, seek an injunction to stop the demolition of the Skinners Falls-Milanville Bridge, which spans the Delaware River between Damascus Township, Pennsylvania, and Cochecton, New York. Originally constructed in 1902, the bridge was added to the National Register of Historic Places in 1998, and has, in the past, been recognized by the National Park Service as having historical and scenic importance. (Doc. 1, ¶¶ 16, 19). However, in December 2024, after multiple inspections demonstrating deterioration of the bridge, Governor Josh Shapiro declared the state of the bridge to be an emergency. Shortly thereafter, after considering several alternatives the Pennsylvania Department of Transportation made the decision to demolish the bridge. Demolition was scheduled to occur on Thursday, April 10, 2025. After this Court granted an emergency temporary restraining order on Wednesday, April 9, 2025, a full hearing on the motion for a preliminary injunction was held on Friday, April 11, 2025.

As more fully set forth below, having considered whether there is a "reasonable likelihood" of success on the merits; "irreparable harm" absent the relief sought; the balance of harms to the parties in granting or denying the instant request; and whether preliminary injunctive relief would serve the public interest, along with the parties' submissions to the Court and a full day of testimony and argument, the motion for preliminary injunction is denied.

I.  **FACTUAL AND PROCEDURAL BACKGROUND**

The plaintiffs in this matter are Damascus Citizens for Sustainability, Inc. ("Damascus Citizens") and Cynthia Nash ("Nash") (collectively, "Plaintiffs"). Damascus Citizens "is a nonprofit organization formed in 2008 under the laws of Pennsylvania to protect the universal elements of life: clean water, air and land, and to preserve natural, scenic, and historic resources." (Doc. 1, ¶ 5). Nash is a resident of Milanville, Pennsylvania, and owns a home 500 feet from the Skinners Falls-Milanville Bridge (the "Bridge"). (Doc. 1, ¶ 6). Plaintiffs initiated this matter by filing their complaint against the Pennsylvania Department of Transportation ("PennDOT"), the Federal Highway Administration ("FHWA"), Pennsylvania Governor Josh Shapiro ("Governor Shapiro"), the United States Department of Transportation ("DOT"), Secretary of the United States Department of Transportation Sean Duffy ("Secretary Duffy"), Acting Administrator of the FHWA Kristen White ("Acting Administrator White"), Acting Administrator of the Pennsylvania Division of the FHWA Alicia Nolan ("Acting Administrator Nolan"), and Secretary of PennDOT Michael Carroll ("Secretary Carroll") (all collectively, "Defendants"). (Doc. 1). On that same date, Plaintiffs filed a motion for preliminary injunction and their supporting brief. (Doc. 8; Doc. 9). Plaintiffs ask this Court to stop the demolition of the Bridge by PennDOT and its contractors, as part of a project by the FHWA.

2

The Bridge crosses the Delaware River and connects Damascus Township, Pennsylvania, and Cochecton, New York. (Doc. 9, at 2). The Bridge is "listed in the National Register of Historic Places. . . and is also within the Upper Delaware Scenic and Recreational River." (Doc. 9, at 2). It has also been recognized by the National Park Service as having "historical and scenic importance" and for being "vital for connecting emergency service providers to the areas where there are incidents requiring law enforcement and medical services." (Doc. 1-4, at 4). While the Bridge is jointly owned by New York and Pennsylvania and managed by the New York- Pennsylvania Joint Interstate Bridge Commission ("the Commission"), primary responsibility for management of the Bridge, including inspections and maintenance, has been delegated to PennDOT. (Doc. 1, ¶ 21).

On April 7, 2025, Plaintiffs filed their complaint, alleging that PennDOT and FHWA failed to follow the administrative procedural requirements of several laws when they made the decision to demolish the Bridge rather than find an alternative way to preserve it. Specifically, Plaintiffs allege violations of the National Environmental Policy Act ("NEPA"), Section 4(f) of the Department of Transportation Act ("Section 4(f)"), the National Historic Preservation Act ("NHPA"), and Pennsylvania state law (Doc. 1), along with a motion for temporary restraining order and preliminary injunction. (Doc. 8; Doc. 9). This Court granted the temporary restraining order on April 9, 2025. (Doc. 13). On April 10, 2025, PennDOT, Governor Shapiro, and Secretary Carrol filed their brief in opposition. (Doc. 18). The Court held a hearing on the motion for a preliminary injunction on April 11, 2025. While all parties made oral argument at the hearing, only Defendants presented testimony and evidence into the record.

**II.   PRELIMINARY INJUNCTION STANDARD**

In considering whether to grant the extraordinary and drastic remedy of a preliminary injunction, a court must consider four factors: (1) whether there is a reasonable likelihood of success on the merits; (2) whether there is a likelihood of irreparable harm absent the relief sought; (3) the harm to Plaintiffs by denying preliminary injunctive relief outweighs the harm to Defendants; and (4) whether preliminary injunctive relief would serve the public interest. *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002). The Third Circuit has placed particular weight on the probability of irreparable harm and the likelihood of success on the merits. *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197 (3d Cir. 1990); *Juul Labs, Inc. v. 4X PODS.*, 439 F.Supp.3d 341, 350 (D.N.J. 2020). Further, a preliminary injunction should not be granted unless the movant, by a clear showing, carries the burden of persuasion on both of these factors. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Instant Air Freight Co.*, 882 F.2d at 800. If the movant fails to carry this burden on these two elements, the motion should be denied. *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir.1989) (emphasis in original) (*quoting Morton v. Beyer*, 822 F.2d 364 (3d Cir. 1987)).

A court must consider the factors "taken together," such that a plaintiff who shows great harm has leeway to show less success on the merits, or a plaintiff who shows less harm must show a high likelihood of success on the merits to warrant a preliminary injunction. *Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017), *as amended* (June 26, 2017); *see also Arthurton-Garvey v. Garvey*, 2024 VI SUPER 34U, ¶ 1 (Super. Ct. Sept. 18, 2024) (analyzing a temporary restraining order and stating, "[t]he court must balance all factors under a sliding-scale analysis while weighing the relative strengths of each [. . . ] Thus, a weak showing of irreparable harm may be overcome by a strong showing on the merits and visa versa.")

(citations omitted) (citing *3RC & Co. v Boynes Trucking System*, 63 V.I. 544, 553, 555-57 (V.I. 2015)); *Word Seed Church v. Vill. of Hazel Crest*, 533 F. Supp. 3d 637, 647 (N.D. Ill. 2021) ("the [c]ourt applies a 'sliding scale' approach under which 'the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor plaintiff's position.'") (quoting *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015)). However, if the record does not support a finding of both irreparable injury and a likelihood of success on the merits, then a preliminary injunction cannot be granted. *Marxe v. Jackson*, 833 F.2d 1121 (3d Cir.1987).

**III.   DISCUSSION**

As stated *supra*, a preliminary injunction is an extraordinary remedy that should only be ordered in limited cases, upon a compelling showing by the movant. Here, Plaintiffs failed to make that showing. While they demonstrate that they will suffer irreparable harm absent the preliminary injunction, Plaintiffs' motion fails on the remaining factors, including, importantly, likelihood of success on the merits.

   A.   IRREPARABLE HARM

To demonstrate irreparable harm, a plaintiff must establish that the feared injury cannot be redressed by a legal or equitable remedy at trial, and that a preliminary injunction is the only way of protecting the plaintiff from harm. *Instant Air Freight Co.*, 882 F.2d at 801. The injury must be of a peculiar nature, irreparable, and not just serious or substantial. *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987). "The word irreparable connotes 'that which cannot be repaired, retrieved, put down again, atoned for. . .'" *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir.1994) (citations omitted).

Plaintiffs submit that the demolition of the Bridge would result in irreparable injury because it would destroy "an exceedingly uncommon type of metal truss bridge with profound historical significance. . . [that] provides a vital link between the communities of Milanville, PA and Cochecton, NY." (Doc. 9, at 11-12). In response, Defendants assert that the Bridge is essentially already lost, as it is beyond repair and will eventually collapse in an uncontrolled manner. (Doc. 18, at 23).

Courts have held that a structure's demolition does constitute irreparable harm. *See Weintraub v. Rural Electrification Administration, U. S. Dept. of Agriculture*, 457 F. Supp. 78, 89 (M.D. Pa. 1978) ("Because the Telegraph Building is in the process of being demolished right now, the Plaintiffs have established irreparable harm if an injunction is not issued to prevent the destruction of the Telegraph Building."); *see also Citizens for Rational Coastal Dev. v. U.S. Fed. Highway Admin.*, No. CIV.A. 07-4551(JAP), 2008 WL 2276005, at *3 (D.N.J. May 30, 2008) (finding irreparable harm where the government scheduled "partial dismantling of certain portions of [an] existing bridge"); *see also Concerned Citizens of Chappaqua v. U.S. Dep't of Transp.*, 579 F. Supp. 2d 427, 432 (S.D.N.Y. 2008). Further, the Court is not persuaded by Defendants' argument that there is no irreparable harm in losing the Bridge because it may collapse in the future. Such argument is speculative, and irreparable harm must be actual and imminent. *See Angstadt ex rel. Angstadt v. Midd-West Sch.*, 182 F. Supp. 2d 435, 437 (M.D. Pa. 2002). As such, this factor weighs in Plaintiffs' favor.

B. LIKELIHOOD OF SUCCESS ON THE MERITS

To establish a reasonable probability of success on the merits, a movant must produce sufficient evidence to satisfy the essential elements of the underlying cause of action. *Punnett v. Carter*, 621 F.2d 578, 582-83 (3d Cir. 1980). District courts must examine the legal principles

controlling the claim and the potential defenses available to the opposing party. *See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 264 (3d Cir. 2000). A mere possibility that the claim might be defeated does not preclude a finding of probable success if the evidence clearly satisfies the essential prerequisites of the cause of action. *Highmark*, 276 F.3d at 173.

      Plaintiffs submit they are likely to succeed on the merits on their claims of violations of NEPA, Section 4(f), and Section 106 of the NHPA.[1] These statutes pertain to regulatory procedure, and as such, determinations of whether PennDOT and FHWA complied with these procedures are "controlled by the 'arbitrary and capricious' standard." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 376 (1989). Under this standard, the decisions of PennDOT and FHWA made under NEPA, NHPA, and Section 4(f), may only be set aside upon a showing by Plaintiffs that the actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citations omitted); s*ee Delaware Dep't of Nat. Res. & Env't Control v. U.S. Army Corps of Eng'rs,* 685 F.3d 259, 271 (3d Cir. 2012) (stating "[j]udicial review of agency conduct under NEPA is deferential. The sole question on review is whether the agency's actions were arbitrary or capricious"); *see also Delaware Riverkeeper Network v. Pennsylvania Dep't of Transportation*, No. CV 18-4508, 2020 WL 4937263, at *29 (E.D. Pa. Aug. 21, 2020) (evaluating NEPA and Section 4(f) claims under the arbitrary and capricious standard). The arbitrary and capricious standard is deferential to the agency, and as such agency action is

---

[1] During concluding arguments at the hearing, Plaintiffs argued for the first time that there was a likelihood of success on two state law claims. However, Plaintiffs did not raise these arguments in their motion, and the Court will not consider them, as "an argument not raised in the opening brief is deemed waived." *Cousins v. Berryhill*, No. 3:17-CV-836, 2017 WL 5070230, at *10 (M.D. Pa. Nov. 3, 2017).

7

upheld if the agency has considered the relevant factors and articulated a rational connection between the facts found and the choice made. *Concerned Citizens of Chappaqua*, 579 F. Supp. 2d 427, at 433 (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983)).

### 1. Plaintiffs fail to demonstrate a likelihood of success on the merits on their NEPA claim.

Plaintiffs argue that PennDOT and FHWA violated NEPA by failing to produce either an environmental impact statement or an environmental assessment. (Doc. 9, at 4-7). According to Plaintiffs, Defendants could only avoid their obligation to produce an environmental impact statement or environmental assessment if their actions fell under an applicable categorical exception. (Doc. 9, at 4-7). Plaintiffs aver that Defendants' cited exception does not apply in this case because the Bridge was damaged by neglect. (Doc. 9, at 4-7). Defendants submit they have fully complied with NEPA because the demolition of the Bridge falls under an exception for emergency repairs. (Doc. 18, at 17-18).

NEPA requires federal agencies to analyze the environmental impact of their proposals and actions. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004). While NEPA itself does not mandate particular results, the Act imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions. *Pub. Citizen*, 541 U.S. at, 756–57. According to the Third Circuit:

> NEPA requires that one of three levels of review be conducted for [FHWA] projects, depending on, among other things, the extent of the environmental impact: (1) actions that significantly affect the environment require an Environmental Impact Statement; (2) actions for which the significance of the environmental impact is unclear require an Environmental Assessment; and (3) actions that do not individually or cumulatively have a significant

8

environmental effect are entitled to a Categorical Exclusion from preparing an Environmental Impact Statement or Environmental Assessment.

*Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.*, 823 F.3d 184, 188 (3d Cir. 2016)

Under NEPA, "an action may be entirely excluded from environmental review. Such an exception is called a 'categorical exclusion' or CE." *Nat'l Ass'n for Advancement of Colored People Erie Unit 2262 v. Fed. Highway Admin.*, 648 F. Supp. 3d 576, 584 (W.D. Pa. 2022). "The FHWA's procedures for categorical exclusions are found at 23 C.F.R. § 771.117." *Nat'l Ass'n for Advancement of Colored People Erie Unit 2262 v. Fed. Highway Admin.*, 648 F. Supp. 3d 576, 584 (W.D. Pa. 2022).

FHWA regulations allow for an exclusion in emergency situations pursuant to 23 C.F.R. § 771.117(c)(9):

> The following actions for transportation facilities damaged by an incident resulting in an emergency declared by the Governor of the State and concurred in by the Secretary, or a disaster or emergency declared by the President pursuant to the Robert T. Stafford Act (42 U.S.C. 5121):
>
> (i)  Emergency repairs under 23 U.S.C. § 125; and
>
> (ii) The repair, reconstruction, restoration, retrofitting, or replacement of any road, highway, bridge, tunnel, or transit facility (such as a ferry dock or bus transfer station), including ancillary transportation facilities (such as pedestrian/bicycle paths and bike lanes), that is in operation or under construction when damaged and the action:
>
>    A. Occurs within the existing right-of-way and in a manner that substantially conforms to the preexisting design, function, and location as the original (which may include upgrades to meet existing codes and standards as well as upgrades warranted to address conditions that have changed since the original construction); and
>
>    B. Is commenced within a 2-year period beginning on the date of the declaration.

23 C.F.R. § 771.117 (c)(9).

9

Defendants assert that the Bridge's demolition qualified as an exclusion under 23 C.F.R. § 771.117 (c)(9) because it was "damaged by an incident with an emergency declaration by the Governor and concurrence by FHWA." (Doc. 9, at 4-7; Doc. 18, at 18). Plaintiffs contend that this exclusion does not apply because it contemplates structures which have been "damaged by incident" and the Bridge's condition is due to neglect, not an incident. (Doc. 9, at 4-7). Defendants respond that "the incident was movement in the abutments and truss as documented in the inspection reports." (Doc. 18, at 18).

The record as established at the hearing demonstrates that PennDOT and FHWA did not act arbitrarily and capriciously in determining the Bridge was "damaged by an incident" and thus covered by their cited exclusion. Two expert witnesses persuasively testified on behalf of PennDOT and FHWA's position. The first, Ezequiel Lujan ("Lujan"), an engineer at FHWA, was admitted as an expert in the field of structural engineering with a specialization in in bridge engineering. The second, Daniel Radle ("Radle"), an engineer at AECOM,[2] was admitted as an expert on bridge rehabilitation. Lujan and Radle's compelling testimony established that Bridge's abutments and vital trusses suffer severe damage and deterioration. Lujan and Radle relied on exhibits admitted into evidence, including an October 2024 bridge inspection report, photos clearly showing severe damage and deterioration to both an abutment and a vital truss of the Bridge on the New York side, and each expert provided descriptions of the severe cracks which could lead to the abutment collapsing. Lujan and Radle also testified that the Bridge's bearings, which are supposed to support its movement, no longer function. The causes the damaged abutments to unsafely

---

[2] According to Radle, AECOM is an engineering firm that consulted with PennDOT to access the viability of rehabilitating or dismantling the Bridge.

10

pull apart. Notably, both experts also testified that once one abutment fails, the entire structure is likely to collapse into the river. Both Lujan and Radle also described the rapid deterioration that will also likely lead to a total collapse of the Bridge into the river. Radle testified that according to a follow-up January 2025 inspection of the Bridge, the damage to the abutments and truss had gotten noticeably worse in the time between October 2024 and January 2025.

Plaintiffs fail to rebut this evidence, undermine it, or otherwise establish that PennDOT and FHWA's determination that the Bridge was damaged by incident in the form of the damage to the abutment and truss was arbitrary and capricious. Plaintiffs did not introduce any contrary expert testimony or otherwise counter the evidence presented by Defendants. When asked about that by the Court, Plaintiffs' counsel asserted that Plaintiffs were unable to employ an expert because nobody is permitted near the Bridge; however, there was no testimony or other evidence establishing that fact.

Plaintiffs also fail to support their assertion that it was neglect that led to the deterioration of the Bridge, or that the deterioration could have been prevented. Plaintiffs cite to the infrequency of repairs and rehabilitation of the Bridge, producing an email from a representative of the Advisory Council on Historic Preservation to FHWA representatives[3]

---

[3] FHWA asserts that the Court should exclude the exhibits attached to the complaint because Plaintiffs did not use them during the hearing and the FHWA had no opportunity to question their authenticity. Plaintiffs submit that the exhibits are admissible because they are mostly state records, and because they are attached to the complaint. Courts have some discretion in deciding whether they will consider evidence that would not be admissible at trial while evaluating a preliminary injunction. *See R.B. ex rel. Parent v. Mastery Charter Sch.*, 762 F. Supp. 2d 745, 747 (E.D. Pa. 2010), *aff'd sub nom. R.B. v. Mastery Charter Sch.*, 532 F. App'x 136 (3d Cir. 2013) (stating "district courts may exercise their discretion in 'weighing all attendant factors, including the need for expedition, to assess whether, and to what extent,
*(footnote continued on next page)*

11

which states "the poor condition of the bridge has been known for at least five years, and it is unclear whether there was any action that could have been taken that would have prevented it's deterioration and potential collapse." (Doc. 9-1, at 2; Doc. 9, at 5). This assertion, however, is contradicted by the expert testimony of Radle and Lujan. Radle testified that he was involved in projects to rehabilitate the Bridge since 2019 but ultimately concluded rehabilitation was impossible. Lujan testified that the Bridge was never intended to last as long as it had, contradicting Plaintiffs' claim that the abutment and truss would be in a safe condition if not for neglect.[4] Plaintiffs presented no evidence countering Defendants' expert testimony or proposing other viable means of repairing the Bridge. As such, Plaintiffs failed to provide any arguments that rebut the determination that the deterioration of the New York abutment and truss constitutes the Bridge being "damaged by incident" under the exclusion, or that PennDOT or FHWA acted in an arbitrary and capricious manner. As such, Plaintiffs cannot establish a likelihood of success on their NEPA claim.

    **2. Plaintiffs fail to demonstrate a likelihood of success on the merits of their Section 4(f) claim.**

Plaintiffs also submit that PennDOT and FHWA did not meet their statutory obligations under Section 4(f), which requires them to consider alternatives and minimize harm before approving demolition of the Bridge. (Doc. 9, at 7-10). Defendants assert that they have fully complied with Section 4(f) because they did consider alternatives to demolition and

---

affidavits or other hearsay materials are appropriate given the character and objectives of the injunctive proceeding'" (citations omitted)).

    [4] Plaintiffs assert that it is possible to repair the bridge through a method called bracing and reference a "Wrought Iron Proposal" in their complaint. (Doc. 1, ¶ 73). Plaintiffs presented no other evidence or testimony about this proposal, but Lujan addressed it, concluding it was not possible because the proposal was based on calculations which would only work on a significantly smaller and less heavy bridge then the Bridge.

12

determined that any alternatives were not possible and would cause more harm to life, property, and the environment. (Doc. 18, at 20-23).

Section 4(f) of the Department of Transportation Act states: "[i]t is the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites." 23 U.S.C.A. § 138 (a)(1). The Act further states:

> [T]he Secretary shall not approve any program or project (other than any project for a Federal lands transportation facility) which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless— (A) there is no feasible and prudent alternative to the use of the land; and (B) the program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.
>
> 23 U.S.C.A. § 138 (c).

According to the Third Circuit:

> Under Section 4(f)(2), the Secretary of Transportation must perform a balancing test when weighing the alternatives under consideration. . . [S]ection 4(f)(2) requires a simple balancing process which totals the harm caused by each alternate route to section 4(f) areas and selects the option which does the least harm. The only relevant factor in making a determination whether an alternative route minimizes harm is the quantum of harm to the park or historic site caused by the alternative.
>
> *Concerned Citizens All., Inc.*, 176 F.3d at 694 (citations omitted)

"In a Section 4(f) challenge, the plaintiff bears the burden of showing by a preponderance of the evidence that the Secretary acted improperly in approving the use of protected property." *Concerned Citizens All., Inc.*, 176 F.3d at 694. "[W]hile the Secretary of Transportation's decision is entitled to a presumption of regularity, a court nevertheless must subject the Secretary's decision to 'probing, in-depth' review." *Concerned Citizens All., Inc.*, 176 F.3d at 694

13

(quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S. Ct. 814 (1971), *abrogated by Califano v. Sanders*, 430 U.S. 99, 97 S. Ct. 980 (1977)). While reviewing a Section 4(f)(2) determination, "a court must decide whether the Secretary's ultimate decision was arbitrary, capricious, or an abuse of discretion. . . This assessment requires an evaluation of whether the decision was based on consideration of the relevant factors and whether there was a clear error of judgment." *Concerned Citizens All., Inc.*, 176 F.3d at 694.

The uncontradicted testimony of Lujan and Radle establishes that Defendants did consider ways to preserve the Bridge, even after Governor Shapiro issued his emergency declaration. Their testimony further supports that proper analyses led experts to believe that it would not be possible to safely repair, rehabilitate, or dissemble the Bridge. More specifically, Lujan testified that to repair the cracked New York abutment, PennDOT would need to lift the superstructure of the Bridge, but doing so would put pressure on the Bridge's deteriorated truss, causing a significant risk of rupturing the truss and a dangerous, uncontrolled collapse of the Bridge. Radle added that if the Bridge was being support by a crane at the time of collapse, the crane could flip and fall in the river. Both experts also testified that bracing the Bridge during potential repairs would be impossible because of its size and weight and its proximity to water, and that even a temporary solution like netting to catch debris is not likely something that could be withstood by the Bridge. Their testimony further supports that PennDOT and the FHWA have explored ways to repair or rehabilitate the Bridge since 2019 but have failed to find a viable method of doing so.

As previously noted, Plaintiffs claim that the Wrought Iron Bridge Proposal is an alternative to demolition. (Doc. 9, at 9; Doc. 9-2; Doc. 9-3). However, Plaintiffs presented no testimony or other evidence at the hearing about this proposal, which the complaint describes

14

as "a set of recommendations from [Damascus's] expert bridge engineer Wrought Iron Bridge Works (WIBW) for non-destructive stabilization of [the Bridge], which would allow the Bridge to be stabilized without large cranes or riverbed disturbances, and done in a way that is non-destructive, less costly, and faster than the proposed demolition." (Doc. 1, ¶ 73). Defendants' expert, Lujan, however, did addressed the proposal. According to him, the proposal is speculative and contemplates a structure far smaller than the Bridge. Nothing in the record disputes Lujan's testimony.

As such, Plaintiffs have not established a likelihood of success on their Section 4(f) claim, as they again have failed to show that Defendants acted arbitrarily or capriciously or otherwise improperly by rejecting or failing alternatives to demolition, such as repairing or disassembling the Bridge.[5]

### 3. Plaintiffs fail to demonstrate a likelihood of success of the merits on their NHPA claim.

Plaintiffs also invoke the NHPA, again arguing that Defendants did not comply with its demands. The NHPA is a procedural statute designed to ensure that, as part of the planning process for properties under the jurisdiction of a federal agency, the agency takes into account any adverse effects on historical places from actions concerning that property, and to provide the Advisory Council on Historic Preservation ("ACHP") a reasonable opportunity to comment on the action. 54 U.S.C.A. § 306108; *Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transp. Bd.*, 252 F.3d 246, 252 (3d Cir. 2001). Plaintiffs allege that Defendants violated

---

[5] The parties also dispute whether PennDOT and FHWA improperly invoked a policy paper to defer certain Section 4(f) determinations until after "emergency repairs" are done. (Doc. 9, 8-10; Doc. 18, at 20-21). As stated, the undisputed expert testimony establishes that alternatives were considered under Section 4(f) and neither PennDOT nor FHWA acted in an arbitrary or capricious manner in rejecting those alternatives.

the NHPA by failing to consider the effects demolishing the Bridge will have on all historic properties and by failing to consult with the ACHP and other consulting parties. (Doc. 9, at 10-11). Defendants aver that PennDOT and the FHWA met the NHPA procedural requirements, providing even more information than what was necessary under the NHPA's emergency rules. (Doc. 18, at 12-16). This Court agrees.

Under the NHPA, if the effects of an agency undertaking are adverse to a historic property, "the agency is required to consider means for alleviating the impacts after consulting the State Historic Preservation Officer ('SHPO'), the [ACPH,] and the public." *Davis v. Latschar*, 202 F.3d 359, 370 (D.C. Cir. 2000) (citations omitted). "The [ACHP] has promulgated regulations outlining the procedures to be followed by an agency in satisfying its responsibilities under § 106 [of NHPA], codified at 36 C.F.R. Part 800." *Friends of the Atglen-Susquehanna Trail, Inc.*, 252 F.3d at 252. These regulations provide exemptions from certain FHWA requirements, and a court should not set aside an agencies' invocation of FHWA regulatory exemptions unless there is sufficient "evidence for the Court to find the defendants' decision not to [comply with certain FHWA consultation requirements] was arbitrary or capricious." *See* 36 C.F.R. § 800.12 (b); *Concerned Citizens of Chappaqua*, 579 F. Supp. 2d at 436. ACHP regulations allow agencies to act quickly in emergency situations stating:

> In the event an agency official proposes an emergency undertaking as an essential and immediate response to a disaster or emergency declared by the President, a tribal government, or the Governor of a State or another immediate threat to life or property, and the agency has not developed procedures pursuant to paragraph (a) of this section, the agency official may comply with section 106 by:
>
> 1. Following a programmatic agreement developed pursuant to § 800.14(b) that contains specific provisions for dealing with historic properties in emergency situations; or

16

> 2. Notifying the Council, the appropriate [State Historic Preservation Officer] and any Indian tribe or Native Hawaiian organization that may attach religious and cultural significance to historic properties likely to be affected prior to the undertaking and affording them an opportunity to comment within seven days of notification. If the agency official determines that circumstances do not permit seven days for comment, the agency official shall notify the Council, the SHPO/THPO and the Indian tribe or Native Hawaiian organization and invite any comments within the time available.

36 C.F.R. § 800.12 (b)

The record reflects that Governor Shapiro declared an emergency and the FHWA alerted the ACHP of the emergency declaration. The ACHP then commented on the plans. (Doc. 9-1). The undisputed record reflects that PennDOT and the FHWA then contacted the Pennsylvania and New York State Historic Preservation Officers, and the State Historic Preservation Officers further commented on the demolition. (Doc. 18-17). Based on the record before the Court, Defendants appear to have met the standards set by the plain language of 36 C.F.R. § 800.12 (b).[6] Plaintiffs have failed to introduce any credible evidence to the contrary. Accordingly, Plaintiffs fail to demonstrate a likelihood of success on their NHPA claim, as they did not show that Defendants acted arbitrarily or capriciously or otherwise improperly denied notice to the appropriate historical societies and parties.

---

[6] In attempting to counter Defendants' assertion that they did provide for comment, Plaintiffs unpersuasively cite to the regulatory definition of "catastrophic failure" as defined in 23 C.F.R. § 668.103. (Doc. 9, at 11). As the Court has determined that the Plaintiffs did not demonstrate that Defendants acted in an arbitrary and capricious manner, and that the record reflects that notice was provided as required under the NHPA, it will not address the issue of the use of the term "catastrophic failure."

C. BALANCE OF HARMS AND PUBLIC INTEREST

The final two preliminary injunction factors, the balance of the parties' relative harms and the public interest, also weigh in favor of denying Plaintiffs' motion. "The comparison of harm to the Government as opposed to the harm to [non-governmental plaintiffs] turns mostly on matters of public interest because these considerations 'merge when the Government is the opposing party.'" *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 332 (3d Cir. 2020) (internal quotes omitted). When considering the public interest, courts consider whether granting a preliminary injunction would lead to "serious public safety concerns." *Citizens for Rational Coastal Dev.*, 2008 WL 2276005, at *7 (finding public interest weighed in favor of allowing the government to demolish a historic bridge "that is in a state of disrepair and which continues to deteriorate" because it "presents serious public safety concern"); *see also Potomac Heritage Trail Ass'n, Inc.*, 2022 WL 7051160, at *20 (finding public safety concerns associated with halting the demolition of a bridge constituted harms to the public interest).

Defendants have cited numerous public safety issues associated with further delay of the Bridge's demolition. While the Court acknowledges Plaintiffs' position that they will be harmed if the Bridge is demolished, expert testimony supports that the Bridge is already on the verge of a collapse. Expert testimony supports that the Bridge's seemingly inevitable collapse would endanger life, property, and the environment, and thus the public. Delaying the Bridge's demolition exacerbates these issues, especially considering the busy summer season which will soon bring many visitors to the Delaware River area. Further, Defendants have demonstrated that they have invested a significant amount of money and effort into investigating whether the Bridge can be salvaged and organizing its demolition. In sum, Defendants would suffer a greater harm if the Court were to grant Plaintiffs' motion, and the

public interest is better served by denying it. These factors thus weigh in favor of denying Plaintiffs' motion.

IV. **CONCLUSION**

For the foregoing reasons, and having considered the record before this Court as to whether there is a "reasonable likelihood" of success on the merits; "irreparable harm" absent the relief sought; the balance of harms to the parties in granting or denying the instant request; and whether preliminary injunctive relief would serve the public interest, Plaintiffs' motion for a preliminary injunction (Doc. 8) is **DENIED**.

An appropriate Order follows.

                                                        **BY THE COURT:**

**Date: April 15, 2025**                                *s/ Karoline Mehalchick*
                                                          **KAROLINE MEHALCHICK**
                                                          **United States District Judge**